Rajiv D. Parikh, Esq.
Justin A. Jacobs, Esq.
**GENOVA BURNS LLC**
494 Broad Street
Newark, New Jersey 07102
Tel: (973) 533-0777
Fax: (973) 533-1112
RParikh@genovaburns.com
JJacobs@genovaburns.com
*Attorneys for Plaintiffs,*
*Jagdish Patel and Kishan Patel*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| JAGDISH PATEL and KISHAN PATEL, | Civil Action No.: |
| Plaintiffs, | |
| v. | |
| JIGNESH PANDYA, KRUPA PATEL, JNP FOODS, LLC, RONAK FOODS, LLC, ROHAN PROPERTIES, LLC, SHREE SIDDHIVINAYAK, LLC, HARIDRA, LLC, SRI PRATHAMESH, LLC, CT PIZZA, LLC, EDISON PIZZA, LLC, JOHN/JANE DOES 1-10, and XYZ COMPANIES 1-10, | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiffs, Jagdish Patel and Kishan Patel ("Plaintiffs"), by way of Complaint against

defendants Jignesh Pandya ("Pandya"), Krupa Patel, JNP Foods, LLC ("JNP Foods"), Ronak

Foods, LLC ("Ronak Foods"), Rohan Properties, LLC ("Rohan Properties"), Shree

Siddhivinayak, LLC ("Shree Siddhivinayak"), Haridra, LLC ("Haridra"), Sri Prathamesh,

LLC ("Sri Prathamesh"), CT Pizza, LLC ("CT Pizza"), Edison Pizza, LLC ("Edison Pizza"),

John/Jane Does 1-10 and XYZ Companies 1-10 (collectively, "Defendants"), allege as

follows:

## INTRODUCTION

1.      This is an action brought by Plaintiffs to redress an elaborate fraud that was perpetrated against them by Defendants.  Specifically, Pandya and Krupa Patel (in concert with various business entities owned and/or controlled by Pandya) induced Plaintiffs to give Pandya money based on numerous misrepresentations relating to the purchase and operation of Pizza Hut franchises in Connecticut and New Jersey.  As a direct result of Pandya's fraud, Plaintiffs have lost nearly one million ($1,000,000.00) dollars and they continue to suffer losses resulting from the fraud.

## PARTIES

2.      Jagdish Patel is an individual and resident of the State of New Jersey, residing at 395 New Dover Road, Colonia, New Jersey 07067.

3.      Kishan Patel is the son of Jagdish Patel and an individual and resident of New Jersey, residing at 395 New Dover Road, Colonia, New Jersey 07067.

4.      Upon information and belief, Jignesh Pandya is an individual and resident of Pennsylvania, residing at 8 Woodland Road, Newtown, Pennsylvania 18940.

5.      Upon information and belief, Krupa Patel is an individual and resident of Pennsylvania.

6.      Upon information and belief, JNP Foods is a limited liability company incorporated in Pennsylvania, with its principal place of business located at 210 E Street Road, Suite 3B, Feasterville-Trevose, Pennsylvania 19053.

7.      Upon information and belief, Ronak Foods is a limited liability company incorporated in Pennsylvania, with its principal place of business located at 210 E Street Road, Suite 3B, Feasterville-Trevose, Pennsylvania 19053.

8.     Upon information and belief, Rohan Properties is a limited liability company incorporated in Pennsylvania, with its principal place of business located at 210 E Street Road, Suite 3B, Feasterville-Trevose, Pennsylvania 19053.

9.     Upon information and belief, Shree Siddhivinayak is a limited liability company incorporated in Pennsylvania, with its principal place of business located at 210 E Street Road, Suite 3B, Feasterville-Trevose, Pennsylvania 19053.

10.     Upon information and belief, Haridra is a limited liability company incorporated in Pennsylvania, with its principal place of business located at 210 E Street Road, Suite 3B, Feasterville-Trevose, Pennsylvania 19053.

11.     Upon information and belief, Sri Prathamesh is a limited liability company incorporated in Pennsylvania, with its principal place of business located at 210 E Street Road, Suite 3B, Feasterville-Trevose, Pennsylvania 19053.

12.     Upon information and belief, CT Pizza is a limited liability company incorporated in Connecticut, with its principal place of business located at 210 E Street Road, Suite 3B, Feasterville-Trevose, Pennsylvania 19053.

13.     Upon information and belief, Edison Pizza is an unincorporated company with no principal place of business that is an alter ego of the other Defendants.

14.     Upon information and belief, John/Jane Does 1-10 and XYZ Companies 1-10 are other persons and/or entities that may be liable to Plaintiffs for the claims made herein. The true names and capacities, whether individual, corporate or otherwise, are unknown to Plaintiffs at this time and Plaintiffs, therefore, file suit against said Defendants by such fictitious names.  Plaintiffs will amend their Complaint to allege the true names and capacities of the fictitious names, if and when ascertained.

## JURISDICTION AND VENUE

15.     This Court has federal question jurisdiction over Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*  Additionally, pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over all of Plaintiffs' state law claims inasmuch such claims are related to Plaintiffs' claims under 18 U.S.C. § 1961, *et seq.* and form part of the same case or controversy.

16.     This Court also has diversity jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a).  Federal subject matter jurisdiction is conferred over Plaintiffs' state law claims based on diversity of citizenship and because the amount in controversy exceeds the sum of Seventy Five Thousand ($75,000.00) dollars, exclusive of interest and costs.

17.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in the District of New Jersey.  For example, statements made as part of the fraud alleged herein were made in this district, documents that were created in furtherance of the fraud alleged herein were signed in this district, a substantial portion of the fraud alleged herein involved the purported purchase and operation of Pizza Hut franchises located in this district, and the victims of the fraud reside in this district.

## FACTS

**A.      PANDYA'S PRIOR FRAUDS:**

18.     Pandya has an extensive history – dating back to at least 2006 – of defrauding individuals in connection with the purported purchase of franchise restaurants.

19.     Upon information and belief, from April 2006 to September 2006, Pandya fraudulently obtained six hundred ten thousand ($610,000.00) dollars collectively from three different individuals.

20.     Upon information and belief, Pandya obtained these funds by falsely promising that each of the investors would be given a share in the ownership of certain franchises.

21.     Upon information and belief, Pandya used the investors' money to purchase certain franchises but failed to transfer any ownership stake in the purchased franchises to the investors.

22.     The details of Pandya's above-noted fraudulent conduct are described in greater detail in a lawsuit filed by Dunkin' Donuts Franchising LLC, among others, against Pandya in the District Court for the Eastern District of Pennsylvania under Dkt. No. 5:11-cv-00865.

**B.     PANDYA/PLAINTIFFS' RELATIONSHIP:**

23.     Jagdish Patel first met Pandya in late 2010 at a party in New Jersey.

24.     During this initial encounter, Pandya impressed Jagdish Patel with tales of his financial accomplishments, including the fact that he owned numerous commercial properties in the United States and India and had a net worth of over one hundred million ($100,000,000.00) dollars.

25.     In response, Jagdish Patel mentioned that his late wife had left money to his children and that he was searching for opportunities to invest these funds on his children's behalf.

26.     Upon discovering that the Patel family had money to invest, Pandya befriended Jagdish Patel, took him to several nice restaurants, and regaled him with success stories of past investments in restaurant franchises.

5

27.     This was all a veiled attempt to make Jagdish Patel comfortable enough with Pandya to invest large sums of money in "joint ventures" – all while Pandya intended to use these ventures to line his own pockets at the expense of the Patel family.

28.     In furtherance of this scheme, Pandya invited Jagdish Patel to his lavish office in Pennsylvania and showed Jagdish Patel an impressive shopping center owned by Pandya.

29.     During these meetings, Pandya would explain that he did not need "partners" to further his businesses but that he saw Jagdish Patel as a friend and, thus, would "help" Plaintiffs find an opportunity to invest.

30.     These statements were intended to make Jagdish believe that Pandya was looking out for the Patel family when in actuality Pandya was planning on defrauding Plaintiffs out of substantial sums of money.

## C.     CONNECTICUT FRANCHISES:

31.     Over a series of multiple meetings between Pandya and Jagdish Patel, Pandya made Plaintiffs an offer to invest with him in the purchase of nine (9) individual Pizza Hut franchises (the "Connecticut Franchises") and development rights for an additional twenty (20) locations (collectively, the "Connecticut Deal").

32.     Pandya represented that the total purchase price for the Connecticut Deal was one million four hundred thousand ($1,400,000.00) dollars and Pandya would be a seventy-five (75%) percent owner with Plaintiffs owning twenty five (25%) percent of the business.

33.     Pursuant to Pandya's offer, he would be responsible for funding one million fifty thousand ($1,050,000.00) dollars of the purchase price and Plaintiffs would be responsible for funding the remaining three hundred fifty thousand ($350,000.00) dollars.

34.     In order to entice Plaintiffs to accept his offer, Pandya represented that the Connecticut Franchises had a history of achieving lucrative profits.

35.     On July 1, 2011, he emailed Jagdish Patel profit projections for the Connecticut Franchises in support of these claims.

36.     The profit projections indicated that the Connecticut Franchises were set to make an annual net profit of over four hundred eighty-eight thousand ($488,000.00) dollars.

37.     Despite requesting further financial information regarding the Connecticut Franchises, no such information was ever provided to the Plaintiffs.

38.     Instead, Pandya would state that his associate, Krupa Patel (the office manager for many companies owned and operated by Pandya), would provide that information.

39.     When Plaintiffs then asked Krupa Patel for same, she would inform them that they needed to speak to Pandya.

40.     This evasion tactic was routinely used by Pandya and Krupa Patel to prevent Plaintiffs from obtaining critical information regarding the companies that Plaintiffs were investing in.

41.     Shortly after receiving the financial projections, Pandya informed Jagdish Patel in a telephone conversation that the projected profits reflected a fully financed deal and, thus, Plaintiffs' annual profit would increase if Plaintiffs paid their portion of the purchase price – i.e., three hundred fifty thousand ($350,000.00) dollars – in cash instead of securing financing for that amount.

42.     Pandya explained that if Plaintiffs paid their portion in cash, they would not be assessed any charges relating to the financing of Pandya's portion of the purchase price.

7

43.     Based on the above-noted representations, Plaintiffs accepted Pandya's offer and opted to pay their portion in cash so that they would make more in profits.

44.     In or about July 2011, Pandya formed a corporation, CT Pizza, to facilitate the Connecticut Deal.

45.      On or about July 12, 2011, Pandya told Plaintiffs that he needed their payment of three hundred fifty thousand ($350,000.00) dollars in cash immediately in order to close the Connecticut Deal.

46.     In response, Plaintiffs wrote a check pursuant to Pandya's express instructions and made it available for pick up that day at their house.

47.     Unbeknownst to Plaintiffs, however, Plaintiffs' contribution of three hundred fifty thousand ($350,000.00) dollars was not used to fund the purchase of the Connecticut Deal.

48.     Instead, Pandya took that money for his own personal gain and financed the entire one million four hundred thousand ($1,400,000.00) dollar purchase price.

49.     In order to conceal these facts from Plaintiffs, Pandya refused to provide Plaintiffs with the closing documents from the purchase of the Connecticut Deal using the evasion tactic.

50.     After the Connecticut Deal closed, Pandya also employed other means that were intended to deceive Plaintiffs into giving him their money.

51.     For example, Pandya ensured that management companies that he owned and/or controlled were retained by CT Pizza at a cost of over six hundred fifty thousand ($650,000.00) dollars annually.

8

52.     As another example, Pandya asked Plaintiffs for additional financial contributions in connection with a purported purchase of liquor licenses for the Connecticut Franchises.

53.     However, upon information and belief, the original purchase price of the Connecticut Franchises actually included liquor licenses for the franchises.

54.     Nevertheless, in August 2011, Pandya expressly stated to Plaintiffs that the liquor licenses were not included in the purchase price of the Connecticut Franchises and needed to be acquired.

55.     Pandya further stated that he had personally purchased the applicable licenses for an additional five hundred thousand ($500,000.00) dollars and that he had expended forty thousand ($40,000.00) dollars in lawyer fees in connection with same.

56.     Pandya stated that Plaintiffs were responsible for reimbursing him for twenty-five (25%) percent of the above amount – i.e., one hundred thirty-five thousand ($135,000.00) dollars.

57.     Pandya did not provide any proof that he had purchased the subject licenses despite requests for same.

58.     Upon information and belief, these actions and misrepresentations were in furtherance of a deliberate scheme to defraud Plaintiffs out of an additional one hundred thirty-five thousand ($135,000.00) dollars.

59.     Based upon Pandya's above representations (and pursuant to his express instructions), on or about August 4, 2011, Plaintiffs gave Pandya the requested one hundred thirty-five thousand ($135,000.00) dollars.

9

60.     The money was wired from the bank account of Sweta Patel (Jagdish Patel's daughter and Kishan Patel's sister) for the benefit of Plaintiffs.

**D.     NEW JERSEY FRANCHISES:**

61.     In late 2011, Pandya continued to mislead Plaintiffs into believing that the Connecticut Franchises were a lucrative investment in order to entice them to enter into an additional and separate fraudulent venture.

62.     In October 2011, Pandya and Jagdish Patel traveled to a Pizza Hut convention in Dallas, Texas.

63.     During the convention, Pandya pitched the idea of another joint venture to Jagdish Patel wherein they would acquire several Pizza Hut franchises located in New Jersey.

64.     Pandya suggested that since Plaintiffs live in New Jersey they could manage the franchises and take a more active role in the operation of the restaurants.

65.     The idea of managing New Jersey restaurants interested Jagdish Patel as Plaintiffs would have more control over the direction of the franchises.

66.     During this conversation, Pandya pointed out that a prominent Pizza Hut franchisee, Hal McCoy, who owned numerous franchises in New Jersey, was in the same room.

67.      Pandya then suggested approaching him to inquire as to whether they could purchase some franchises from McCoy.

68.     However, instead of both of them approaching McCoy, Pandya told Jagdish Patel to wait while he spoke to McCoy alone, since Pandya was a prominent Pizza Hut franchisee.

10

69. Per their discussion, Pandya approached McCoy while Jagdish Patel observed from across the room.

70. After speaking with McCoy, Pandya returned across the room and informed Jagdish Patel that McCoy had agreed to sell them nine (9) Pizza Hut franchises in New Jersey (the "New Jersey Franchises") and development rights for additional locations in Monmouth, Middlesex, and Mercer counties (the "New Jersey Deal").

71. Pandya represented they had an agreement in principle and that they just needed to finalize the purchase price for the acquisition through a company called Edison Pizza, LLC ("Edison Pizza").

72. After returning to New Jersey from the Pizza Hut convention, Pandya called Jagdish Patel and informed him that the purchase price for the New Jersey Deal would be five million nine hundred thousand ($5,900,000.00) dollars.

73. Pandya further represented that Pandya and Plaintiffs would be required to make a down payment for the New Jersey Deal (that would be placed in escrow) in the amount of one million, one hundred eighty thousand ($1,180,000.00) dollars.

74. Pandya also provided the exact locations of the New Jersey Franchises and represented that the collective annual sales volume for the franchises was seven million, five hundred seventy-four thousand ($7,574,000.00) dollars.

75. Pursuant to Pandya's offer, Plaintiffs would own a twenty-five (25%) percent stake in Edison Pizza (and would be responsible for paying two hundred ninety-five thousand ($295,000.00) dollars of the down payment for the New Jersey Deal.

76.     Based on Pandya's above-noted representations, as well as his representations made in connection with the Connecticut Deal, Plaintiffs agreed to partner with Pandya on the New Jersey Deal.

77.     On December 16, 2011, Jagdish Patel sent an e-mail to Pandya asking him to identify the attorney trust account in which to deposit the two hundred ninety-five thousand ($295,000.00) dollars that was to be used for the New Jersey Deal.

78.     In response, by way of e-mail dated December 16, 2011, Pandya stated that: "I already paid the amount to Robert Nathan, Esq. escrow about a month ago so you would write the check to me."

79.     Based on this representation, Plaintiffs gave Pandya a check made out to him personally in the amount of two hundred ninety-five thousand ($295,000.00) dollars.

80.     Thereafter, Jagdish Patel suggested a 50-50 partnership for the New Jersey Deal instead of the 75-25 arrangement.

81.     In response, Pandya stated that he would only be willing to let Plaintiffs own forty (40%) percent of the New Jersey Deal.

82.     As such, on December 26, 2011, Plaintiffs agreed to purchase an additional fifteen (15%) percent stake in Edison Pizza for one hundred eighty-five thousand ($185,000.00) dollars to also be used for the down payment of the New Jersey Deal – bringing Plaintiffs' ownership stake to forty (40%) percent.

83.     Plaintiffs then provided Pandya with a check in the amount of one hundred eighty-five thousand ($185,000.00) dollars, as he had previously represented that he advanced the entire amount of the down payment for the New Jersey Deal into Robert Nathan, Esq.'s attorney trust account.

12

84.     Unbeknownst to Plaintiffs, however, Pandya had no intention of closing on the New Jersey Deal and, instead, Pandya sought to use Plaintiffs' money for his own personal gain without giving Plaintiffs anything in exchange for that money.

85.     Indeed, despite representations to the contrary, Pandya never incorporated Edison Pizza and no such entity currently exists.

86.     Nor did he ever enter into any deal with Hal McCoy to acquire the New Jersey Franchises.

87.     Pandya also never deposited any of his own money in the trust account of Robert Nathan, Esq. to be used for the purchase of the New Jersey Deal.

88.     Instead, Pandya deliberately misrepresented the above-noted facts regarding the New Jersey Deal in order to induce Plaintiffs to give him money for a stake in a company that does not exist and has never existed.

## E.     THE CONNECTICUT AND NEW JERSEY FRAUDS FALL APART:

89.     In 2012, Pandya concealed the fact that Connecticut Franchises were losing money and the New Jersey Deal was never a reality.

90.     In September 2012, Pandya gave Plaintiffs a check totaling approximately thirty-four thousand ($34,000.00) dollars representing a supposed profit payment for the Connecticut Franchises from the four months (August 21, 2011 to December 31, 2011) that the franchises were owned by CT Pizza in 2011.

91.     This figure was incorrect, however, as Pandya improperly charged Plaintiffs for finance charges assessed in connection with the one million, four hundred thousand ($1,400,000.00) dollar debt obligation (even though Plaintiffs had paid their twenty-five (25%) percent share in full).

13

92.     Though the early returns for CT Pizza seemed promising, the franchises faltered shortly thereafter and Pandya started routinely seeking additional money in the form of capital contributions.

93.     Pandya blamed the poor performance on a fire at one of the stores (which, upon information and belief, had occurred years prior), Hurricane Sandy, and the opening of two new stores.

94.     As these excuses did not add up, Plaintiffs demanded to review all applicable financial records, including those that preceded the acquisition of the Connecticut Franchises.

95.     Despite having access to these records and an obligation to provide same to Plaintiffs, Pandya withheld critical information from Plaintiffs (using evasion tactics) in order to conceal his fraud.

96.     Pandya also attempted to conceal the fraud by altering the closing documents from the purchase of the Connecticut Franchises.

97.     When pressed by Plaintiffs to produce those closing documents, Pandya altered the documents with his associate, Krupa Patel.

98.     Specifically, Pandya and Krupa Patel altered the documents to make it appear as though the purchase price of the Connecticut Franchises was two million, three hundred seventy thousand, sixty-three dollars and eighty-eight cents ($2,370,063.88).

99.     Additionally, Pandya and Krupa Patel altered the closing documents to make it appear as though the liquor licenses were not included in the purchase price of the Connecticut Franchises.

100.    Pandya and Krupa Patel then produced altered copies of those documents by attaching same to an e-mail sent to Plaintiffs and represented to Plaintiffs that the altered copies were actually genuine copies of the closing documents.

101.    Plaintiffs have since discovered the fraud and demanded, among other things, unaltered copies of all CT Pizza records.

102.    Pandya and Krupa Patel have inexplicably refused to provide same to Plaintiffs.

103.    Moreover, Plaintiffs have become aware that the New Jersey Deal was never closed and demanded the return of their money that was earmarked for the down payment on that deal.

104.    When confronted, Pandya has refused to return Plaintiffs' money.

105.    He has also refused to provide the contact information for Robert Nathan, Esq. in a last-ditch attempt to conceal his fraud

106.    Moreover, Pandya threatened that if Plaintiffs demanded their money back, there would be a loss of four hundred thousand ($400,000.00) dollars plus attorneys' fees.

107.    These statements were false and intended to discourage Plaintiffs from seeking the immediate return of their money.

108.    Undeterred, Plaintiffs have repeatedly demanded the return of their money that was given to Pandya in connection with the New Jersey deal and Pandya has refused to return said amounts.

**F.    USE OF DEFENDANT BUSINESS ENTITIES TO FACILITATE THE FRAUDS:**

109.    The following business entities are alter egos of Pandya: JNP Foods, Ronak Foods, Rohan Properties, Shree Siddhivinayak, Haridra, Sri Prathamesh, CT Pizza, Edison Pizza, and XYZ Companies (the "Alter Ego Business Entities").

110.    Upon information and belief, Pandya exercised control over the Alter Ego Business Entities in furtherance of the above-noted frauds.

111.    Upon information and belief, the Alter Ego Business Entities are closely identified with the affairs of one another as well as Pandya's personal and family affairs.

112.    Upon information and belief, the Alter Ego Business Entities intermingle funds between one another and Pandya's personal accounts with substantial disregard for the separate nature of each such entity.

113.    Upon information and belief, the Alter Ego Business Entities have common owners, common management, and operate in each other's names.

## FIRST CLAIM FOR RELIEF
### (FRAUD)

114.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 113 of the Complaint as if fully set forth herein.

115.    Pandya made numerous misrepresentations to Plaintiffs, including, but not limited to, the following: (1) stating that Plaintiffs' money would be used to partially fund the purchase price of the Connecticut Franchises; (2) stating that the liquor licenses were not included in the purchase price of the Connecticut Franchises and needed to be obtained separately; (3) misrepresenting the financial status of the Connecticut Franchises; and (4) misleading Plaintiffs as to the details of the New Jersey Deal, including the misrepresentation that Pandya had deposited funds into Robert Nathan, Esq.'s trust account.

116.    Pandya knew that the above-noted misrepresentations were false when the statements were made.

16

117.    Pandya made the misrepresentations with the intention that Plaintiffs would rely upon them to their detriment.

118.    Pandya made the misrepresentations with the intent to deceive Plaintiffs and cause them to suffer damages.

119.    Based upon Pandya's reputation as a successful and wealthy business man, Plaintiffs reasonably trusted Pandya to relay truthful information to them regarding the acquisitions of the Connecticut and New Jersey Franchises.

120.    Plaintiffs justifiably relied upon Pandya's misrepresentations in taking actions that ultimately damaged Plaintiffs, including, but not limited to, the following actions: (1) giving Pandya three hundred fifty thousand ($350,000.00) dollars to acquire the Connecticut Franchises; (2) giving Pandya one hundred thirty-five thousand ($135,000.00) dollars to acquire liquor licenses for the Connecticut Franchises; and (3) giving Pandya four hundred eighty thousand ($480,000.00) dollars to acquire the New Jersey Franchises.

**WHEREFORE**, Plaintiffs demand judgment against Pandya, Krupa Patel, and the Alter Ego Business Entities (as alter egos of Pandya) jointly and severally, for compensatory damages, consequential damages, punitive damages, attorney's fees and costs of suit, prejudgment and post-judgment interest, contribution, indemnification, and such other and further relief as the Court may deem just and equitable.

## SECOND CLAIM FOR RELIEF
### (FEDERAL RICO, 18 U.S.C. § 1961, *et seq.*)

121.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 120 of the Complaint as if fully set forth herein.

122.    Each Defendant is a "person" as that term is defined in 18 U.S.C. § 1961(3).

123.    Defendants, collectively, constitute an "enterprise" as that term is defined in 18 U.S.C. § 1961(4) (the "Enterprise").

124.    From no later than July 2011 to present, Defendants associated together for a common purpose and were an ongoing organization.

125.    The Enterprise had an existence separate and apart from the pattern of racketeering, and functioned as a continuing unit with a hierarchical decision-making structure, with Pandya as the leader and Krupa Patel as second-in-command.

126.    Pandya and Krupa Patel directed the other Defendants and non-parties to take actions in furtherance of the fraudulent purpose of the Enterprise.

127.    The Enterprise engaged in activities that affect interstate commerce, namely the theft by deception from purported investors who intended to invest in franchises located across Connecticut and New Jersey.

128.    Pandya supervised and controlled the Enterprise and directed the affairs of the Enterprise by, among other things, transmitting and causing to be transmitted communications by wire and mail related to the above-noted New Jersey and Connecticut frauds.

129.    Pandya used the mails in furtherance of the fraudulent purpose of the Enterprise.

130.    Pandya transmitted numerous communications by wire in furtherance of the fraudulent purpose of the Enterprise – including, but not limited to, the e-mail communications identified above.

131.    By knowingly and willfully transmitting and causing to be transmitted the above-noted communications by wire and mail in furtherance of the New Jersey and Connecticut

frauds, Defendants have participated in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

132.    As a result of the pattern of racketeering activity in which Defendants participated, Plaintiffs have suffered damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs demand judgment against Pandya, Krupa Patel, and the Alter Ego Business Entities (as alter egos of Pandya) jointly and severally, for compensatory damages, consequential damages, punitive damages, attorney's fees and costs of suit, prejudgment and post-judgment interest, contribution, indemnification, and such other and further relief as the Court may deem just and equitable.

### THIRD CLAIM FOR RELIEF
### (NEW JERSEY RICO, N.J.S.A. 2C:41-1, *et seq.*)

133.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 132 of the Complaint as if fully set forth herein.

134.    Each Defendant is a "person" as that term is defined in N.J.S.A. 2C:41-1(b).

135.    Defendants, collectively, constitute an "enterprise" as that term is defined in N.J.S.A. 2C:41-1(c) (the "Enterprise").

136.    From no later than July 2011 to present, Defendants associated together for a common purpose and were an ongoing organization.

137.    The Enterprise had an existence separate and apart from the pattern of racketeering, and functioned as a continuing unit with a hierarchical decision-making structure, with Pandya as the leader and Krupa Patel as second-in-command.

138.    Pandya and Krupa Patel directed the other Defendants and other non-parties to take actions in furtherance of the fraudulent purpose of the Enterprise.

139.   The Enterprise engaged in activities that affect trade, namely the theft by deception from purported investors who intended to invest in franchise restaurants.

140.   Pandya supervised and controlled the Enterprise and directed the affairs of the Enterprise by, among other things, transmitting and causing to be transmitted communications by wire and mail related to above-noted New Jersey and Connecticut frauds – examples of which are identified above.

141.   By knowingly and willfully transmitting and causing to be transmitted the above-noted communications by wire and/or mail in furtherance of the New Jersey and Connecticut frauds, Defendants have participated in a pattern of racketeering activity in violation of N.J.S.A. 2C:41-1(c).

142.   As a result of the pattern of racketeering activity in which Defendants participated, Plaintiffs have suffered damages in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs demand judgment against Pandya, Krupa Patel, and the Alter Ego Business Entities (as alter egos of Pandya) jointly and severally, for compensatory damages, consequential damages, punitive damages, attorney's fees and costs of suit, prejudgment and post-judgment interest, contribution, indemnification, and such other and further relief as the Court may deem just and equitable.

### FOURTH CLAIM FOR RELIEF
### (FRAUDULENT INDUCEMENT)

143.   Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 142 of the Complaint as if fully set forth herein.

144.   Pandya made false material misrepresentations to Plaintiffs, including, but not limited to, the misrepresentations identified in Paragraph 115 above.

145.    Pandya made the misrepresentations with the intent that they would be relied upon by Plaintiffs and induce Plaintiffs to enter into certain agreements with Pandya.

146.    Plaintiffs justifiably relied on the material misrepresentations to their detriment by entering into certain agreements with Pandya – i.e., the agreement to purchase twenty-five (25%) percent of CT Pizza, the agreement to contribute to the purchase of the liquor licenses for the Connecticut Franchises, and the agreement to purchase forty (40%) percent of Edison Pizza (collectively, the "Pandya-Patel Agreements").

147.    Plaintiffs would not have entered into the Pandya-Patel Agreements had they known the truth about the above-noted misrepresentations by Pandya.

148.    Pandya knew that Plaintiffs were under a misapprehension as the terms of the Pandya-Patel Agreements at the time that Plaintiffs entered into the agreements.

149.    Plaintiffs were damaged as a result of their reliance on Pandya's misrepresentations in entering into the Pandya-Patel Agreements.

**WHEREFORE**, Plaintiffs demand judgment against Pandya, Krupa Patel, and the Alter Ego Business Entities (as alter egos of Pandya) jointly and severally, for compensatory damages, consequential damages, punitive damages, attorney's fees and costs of suit, rescission, prejudgment and post-judgment interest, contribution, indemnification, and such other and further relief as the Court may deem just and equitable.

<u>FIFTH CLAIM FOR RELIEF</u>
**(NEGLIGENT MISREPRESENTATION CAUSING HARM)**

150.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 149 of the Complaint as if fully set forth herein.

21

151.    Pandya had a duty to provide accurate information to Plaintiffs related to the Pandya-Patel Agreements.

152.    Pandya intentionally and negligently provided false information to Plaintiffs, including, but not limited to, the misrepresentations identified in Paragraph 115 above.

153.    Plaintiffs justifiably relied upon those misrepresentations in entering into the Pandya-Patel Agreements.

154.    Plaintiffs suffered harms that were proximately and foreseeably caused by their reliance on the misrepresentations.

**WHEREFORE**, Plaintiffs demand judgment against Pandya, Krupa Patel, and the Alter Ego Business Entities (as alter egos of Pandya) jointly and severally, for compensatory damages, consequential damages, punitive damages, attorney's fees and costs of suit, prejudgment and post-judgment interest, contribution, indemnification, and such other and further relief as the Court may deem just and equitable.

### SIXTH CLAIM FOR RELIEF
### (CONVERSION)

155.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 154 of the Complaint as if fully set forth herein.

156.    Plaintiffs are entitled to and demanded the immediate return of the following amounts paid to Pandya: (1) three hundred fifty thousand ($350,000.00) dollars that was to be used to acquire the Connecticut Franchises; (2) one hundred thirty-five thousand ($135,000.00) dollars that was to be used to acquire liquor licenses for the Connecticut Franchises; and (3) four hundred eighty thousand ($480,000.00) dollars that was to be used to acquire the New Jersey Franchises (the "Converted Amounts").

157.   Pandya has refused to return the Converted Amounts to Plaintiffs.

158.   Pandya's failure to return the Converted Amounts constitutes a willful deprivation of Plaintiffs' property.

159.   Pandya exercises exclusive dominion and control over the Converted Amounts by interfering with Plaintiffs' right of possession to same, and depriving Plaintiffs of the use of same.

160.   Pandya is liable to Plaintiffs for the full value of the Converted Amounts as well as all damages, including punitive damages, proximately caused by Pandya's wrongful conduct.

**WHEREFORE**, Plaintiffs demand judgment against Pandya, Krupa Patel, and the Alter Ego Business Entities (as alter egos of Pandya) jointly and severally, for compensatory damages, consequential damages, punitive damages, attorney's fees and costs of suit, prejudgment and post-judgment interest, contribution, indemnification, and such other and further relief as the Court may deem just and equitable.

## SEVENTH CLAIM FOR RELIEF
### (BREACH OF CONTRACT - CT PIZZA AGREEMENT)

161.   Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 160 of the Complaint as if fully set forth herein.

162.   Plaintiffs and Pandya entered into a contract whereby Plaintiffs were to pay Pandya three hundred fifty thousand ($350,000.00) dollars in exchange for twenty-five (25%) percent of CT Pizza.

163.    Pursuant to that agreement, Pandya was to use Plaintiffs' three hundred fifty thousand ($350,000.00) dollars (as well as money that Pandya contributed to CT Pizza) to purchase the Connecticut Franchises.

164.    Pandya materially breached this contract by failing to use Plaintiffs' three hundred fifty thousand ($350,000.00) dollars to purchase the Connecticut Franchises.

165.    Pandya materially breached this contract by failing to use any of his own money to purchase the Connecticut Franchises.

166.    Plaintiffs have suffered damages as a direct and foreseeable result of Pandya's breaches because Plaintiffs' stake in CT Pizza and the value of CT Pizza has been greatly diminished due to Pandya's wrongful actions.

167.    Plaintiffs have complied with all conditions precedent to the bringing of this action or, in the alternative, Pandya has waived and/or is estopped from raising conditions precedent as a defense.

**WHEREFORE**, Plaintiffs demand judgment against Pandya, Krupa Patel, and the Alter Ego Business Entities (as alter egos of Pandya) jointly and severally, for compensatory damages, consequential damages, punitive damages, attorney's fees and costs of suit, prejudgment and post-judgment interest, contribution, indemnification, and such other and further relief as the Court may deem just and equitable.

### EIGHTH CLAIM FOR RELIEF
### (BREACH OF CONTRACT – LIQUOR LICENSE AGREEMENT)

168.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 167 of the Complaint as if fully set forth herein.

24

169.    Plaintiffs and Pandya entered into a second agreement whereby Pandya agreed to purchase liquor licenses for the Connecticut Franchises.

170.    Pursuant to that agreement, Plaintiffs agreed to pay twenty-five (25%) percent of the purchase price of the liquor licenses – i.e., one hundred thirty-five thousand ($135,000.00) dollars.

171.    Pandya breached this agreement by failing to purchase the liquor licenses pursuant to the terms of the parties' agreement.

172.    Plaintiffs have suffered damages as a direct and foreseeable result of Pandya's breach of contract.

173.    Plaintiffs have complied with all conditions precedent to the bringing of this action or, in the alternative, Pandya has waived and/or is estopped from raising conditions precedent as a defense.

**WHEREFORE**, Plaintiffs demand judgment against Pandya, Krupa Patel, and the Alter Ego Business Entities (as alter egos of Pandya) jointly and severally, for compensatory damages, consequential damages, punitive damages, attorney's fees and costs of suit, prejudgment and post-judgment interest, contribution, indemnification, and such other and further relief as the Court may deem just and equitable.

## NINTH CLAIM FOR RELIEF
### (BREACH OF CONTRACT – EDISON PIZZA AGREEMENT)

174.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 173 of the Complaint as if fully set forth herein.

25

175.    Plaintiffs and Pandya entered into a third contract whereby Plaintiffs were to pay Pandya four hundred eighty thousand ($480,000.00) dollars in exchange for a forty (40%) percent stake in Edison Pizza.

176.    Pursuant to the agreement, Pandya was to use that money (as well as his own down payment contribution) to purchase the New Jersey Franchises.

177.    Pandya materially breached this contract by failing to use Plaintiffs' four hundred eighty thousand ($480,000.00) dollars to purchase the New Jersey Franchises.

178.    Pandya materially breached this contract by failing to use any of his own money to purchase the New Jersey Franchises.

179.    Pandya materially breached the contract by failing to return Plaintiffs' money when it was discovered that the New Jersey Franchises were not acquired.

180.    Plaintiffs have suffered damages as a direct and foreseeable result of Pandya's breaches of contract.

181.    Plaintiffs have complied with all conditions precedent to the bringing of this action or, in the alternative, Pandya has waived and/or is estopped from raising conditions precedent as a defense.

**WHEREFORE**, Plaintiffs demand judgment against Pandya, Krupa Patel, and the Alter Ego Business Entities (as alter egos of Pandya) jointly and severally, for compensatory damages, consequential damages, punitive damages, attorney's fees and costs of suit, prejudgment and post-judgment interest, contribution, indemnification, and such other and further relief as the Court may deem just and equitable.

26

## TENTH CLAIM FOR RELIEF
### (BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING)

182.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 181 of the Complaint as if fully set forth herein.

183.    Plaintiffs and Pandya entered into the Pandya-Patel Agreements.

184.    Pandya acted with bad motive and engaged in bad faith conduct with the express purpose of depriving Plaintiffs of benefits under those agreements.

185.    Plaintiffs have suffered damages as a direct and foreseeable result of Pandya's breaches of the implied covenant of good faith and fair dealing.

**WHEREFORE**, Plaintiffs demand judgment against Pandya, Krupa Patel, and the Alter Ego Business Entities (as alter egos of Pandya) jointly and severally, for compensatory damages, consequential damages, punitive damages, attorney's fees and costs of suit, prejudgment and post-judgment interest, contribution, indemnification, and such other and further relief as the Court may deem just and equitable.

## ELEVENTH CLAIM FOR RELIEF
### (UNJUST ENRICHMENT)

186.    Plaintiffs repeat and re-allege the allegations set forth in Paragraphs 1 through 185 of the Complaint as if fully set forth herein.

187.    Based on Pandya's actions (as described herein), he has received numerous benefits that he was not entitled to receive, including, but not limited to, the Converted Amounts.

188.    The retention of those benefits without remuneration to Plaintiffs would be unjust.

**WHEREFORE**, Plaintiffs demand judgment against Pandya, Krupa Patel, and the Alter Ego Business Entities (as alter egos of Pandya) jointly and severally, for compensatory damages, consequential damages, punitive damages, attorney's fees and costs of suit, prejudgment and post-judgment interest, contribution, indemnification, and such other and further relief as the Court may deem just and equitable.

Respectfully submitted,

By:     s/ Rajiv D. Parikh
        Rajiv D. Parikh, Esq.
        **GENOVA BURNS LLC**
        494 Broad Street
        Newark, New Jersey 07102
        Tel: (973) 533-0777
        Fax: (973) 533-1112
        RParikh@genovaburns.com
        *Attorneys for Plaintiffs,*
        *Jagdish Patel and Kishan Patel*

Dated: December 31, 2014

28

## JURY DEMAND

Plaintiffs demand a trial by jury as to all issues so triable.

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to L. Civ. R. 11.2, the undersigned counsel for Plaintiffs hereby certifies that this matter in controversy is not the subject of any action pending in any court, or of any pending arbitration or administrative proceeding.

## LOCAL CIVIL RULE 201.1(d)(3) CERTIFICATION

Pursuant to L. Civ. R. 201(d)(3), the undersigned counsel for Plaintiffs hereby certifies that the amount in controversy exceeds $150,000.00.

By:    s/ Rajiv D. Parikh
Rajiv D. Parikh, Esq.
**GENOVA BURNS LLC**
494 Broad Street
Newark, New Jersey 07102
Tel: (973) 533-0777
Fax: (973) 533-1112
RParikh@genovaburns.com
*Attorneys for Plaintiffs,*
*Jagdish Patel and Kishan Patel*

Dated: December 31, 2014

22109 /001 /12782157 v9

29