# AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY
# OPERATING AGREEMENT OF
# CT PIZZA, LLC

This Amended and Restated Limited Liability Company Operating Agreement (this "Agreement") is entered into this 12th day of July, 2011, by and among the signatories hereto.

## BACKGROUND

A.    On July 5, 2011 Articles of Organization for CT Pizza, LLC ("Company") were filed with the Connecticut Secretary of State in accordance with the Connecticut Limited Liability Company Act (Conn. Gen. Stat. Ann. 34-100 et seq.), as amended ("Law"), wherein Jignesh N. Pandya was the Sole Member.

B.    On July 12th, 2011 Jignesh N. Pandya sold twenty-five (25%) percent of his Membership Interest to Kishan J. Patel.

C.    Jignesh N. Patel and Kishan J. Patel agree that collectively they are the sole Members of the Company and desire to amend and restate the Limited Liability Company Agreement as more fully set forth herein.

NOW THEREFORE, intending to be legally bound, and incorporating the Background above, the parties agree as follows:

## Section I.
## Defined Terms

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"Adjusted Capital Account Deficit" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)    The deficit shall be decreased by the amounts which the Interest Holder is obligated to restore pursuant to Section 4.4.2, or is deemed obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

(ii)    The deficit shall be increased by the items described in Regulation Section 1.704-1(b)(2)(ii)-(d)(4), (5), and (6).

"Adjusted Capital Balance" means, as of any day, an Interest Holder's total Capital Contributions less all amounts actually distributed to the Interest Holder pursuant to Sections

4.2.3.4.1 and 4.4 hereof.  If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance is attributable to the Interest transferred.

"Affiliate" means, with respect to any Member, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such specified Person.  For purposes of this definition, the term "control" means the power to direct or cause the direction of the management of a Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlled" and "controlling" have correlative meanings.

"Agreement" means this Agreement, as amended from time to time.

"Capital Account" means the account to be maintained by the Company for each Interest Holder in accordance with the following provisions:

(i)     An Interest Holder's Capital Account shall be credited with the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's distributive share of Profit and any item in the nature of income or gain specially allocated to such Interest Holder pursuant to the provisions of Section IV (other than Section 4.3.3); and

(ii)     An Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder, the amount of any liabilities of the Interest Holder assumed by the Company (or which are secured by property contributed by the Interest Holder to the Company), the Interest Holder's distributive share of Loss, and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Section IV (other than Section 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the Interest transferred.  If the book value of Company property is adjusted pursuant to Section 4.3.3, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment.  It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"Capital Contribution" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.



"Capital Proceeds" means the gross receipts received by the Company from a Capital Transaction.

"Capital Transaction" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds.

"Cash Flow" means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay current operating expenses including, but not limited to, any management fees, and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as determined by the Manager in its sole discretion. Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"Company" means the limited liability company formed in accordance with this Agreement.

"Interest" means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

"Interest Holder" means any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

> (i)    The Member makes an assignment for the benefit of creditors;

> (ii)   The Member files a voluntary petition of bankruptcy;

> (iii)  The Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

> (iv)   The Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

> (v)    The Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;



(vi)     The Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(vii)     Any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii)     If the Member is an individual, the Member's death or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

(ix)     If the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(x)     If the Member is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(xi)     If the Member is a corporation, the dissolution of the corporation or the revocation of its charter; or

(xii)     If the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

"Law" means the Connecticut Limited Liability Company Law, Conn. Gen. Stat. Ann. 34-100 et seq., as amended from time to time.

"Manager" is the Person designated as such in Section V.

"Member" means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company.

"Member Loan Nonrecourse Deductions" means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Regulation Section 1.704-2(i).

"Membership Rights" means a Member's Interest and a Member's right to vote on matters coming before the Company that require the approval of the Members.



"Minimum Gain" has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

"Negative Capital Account" means a Capital Account with a balance of less than zero.

"Nonrecourse Deductions" has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

"Nonrecourse Liability" means any liability of the Company with respect to which no Member has personal liability determined in accordance with Code Section 752 and the Regulations promulgated thereunder.

"Percentage" means, as to a Member, the percentage set forth after the Member's name on Exhibit A, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest.

"Person" means and includes any individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"Positive Capital Account" means a Capital Account with a balance greater than zero.

"Profit" and "Loss" mean, for each taxable year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

     (i)     All items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

     (ii)     Any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

     (iii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

     (iv)     Gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;



(v)     In lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

(vi)     Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

"Regulation" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"Transfer" means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment, or other transfer; and, when used as a verb, means, voluntarily to sell, hypothecate, pledge, assign, or otherwise transfer.

"Voluntary Withdrawal" means a Member's dissociation with the Company by means other than by a Transfer or an Involuntary Withdrawal.

## Section II.
## Formation and Name: Office; Purpose; Term

2.1.     Organization.  The parties shall organize a limited liability company pursuant to the Law and the provisions of this Agreement and, for that purpose, shall cause Articles of Organization, in the form prescribed by the Connecticut Department of State, to be executed and filed for record with the Connecticut Department of State.

2.2.     Name of the Company.  The name of the Company shall be CT Pizza, LLC.  The Company may do business under that name and under any other name or names which the Manager selects.

2.3.     Purpose.  The Company is formed for the purpose of engaging in any lawful business, purpose or activity for which limited liability companies may be formed under the Law including, but not limited to, the purchase and operation of nine (9) Pizza Hut stores in Connecticut.  The Company shall possess and may exercise all of the powers and privileges granted by the Law or by any other law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company.

2.4.     Term.  The term of the Company shall begin upon the filing of the Articles of Organization with the Connecticut Department of State and shall continue in existence until its existence is sooner terminated pursuant to Section VII of this Agreement.

2.5.     Registered Office; Principal Office.   The registered agent in the State of Connecticut in Business Filings Incorporated with an address of One Corporate Center 11th Floor, Hartford, CT  06103 and the principal place of business of the Company shall be located

at 210 E. Street Road, Suite 3B, Feasterville, PA 19053, or such other place or places as the Manager may select.

2.6.    Members.  The name, present mailing address, and Percentage of each Member are set forth on Exhibit A.

## Section III.
## Members; Capital; Capital Accounts

3.1.    Initial Capital Contributions.    Upon the execution of this Agreement, the Members shall contribute to the Company cash and other consideration as agreed to by the Members.

3.2.    Additional Capital Contributions.

3.2.1.  If the Manager at any time or from time to time determines that the Company requires additional Capital Contributions, then the Manager shall give notice to each Member of (i) the total amount of additional Capital Contribution that is required, (ii) the reason the additional Capital Contribution is required, (iii) each Member's proportionate share of the total additional Capital Contribution (determined in accordance with this Section), and (iv) the date each Member's additional Capital Contribution is due and payable.  A Member's proportionate share of the total additional Capital Contribution shall be equal to the product obtained by multiplying the Member's Percentage and the total additional Capital Contribution required.  A Member's proportionate share shall be payable in cash or by certified check.

3.2.2.  Except as provided in Section 3.2.1, no Member shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any obligation of the Company.

3.2.3.  If a Member fails to pay when due all or any portion of any Capital Contribution, the Manager shall request the non-defaulting Members to pay the unpaid amount of the defaulting Member's Capital Contribution (the "Unpaid Contribution").  To the extent the Unpaid Contribution is contributed by any other Member, the defaulting Member's Percentage shall be reduced and the Percentage of each Member who makes up the Unpaid Contribution shall be increased, so that each Member's Percentage is equal to a fraction, the numerator of which is that Member's total Capital Contribution and the denominator of which is the total Capital Contributions of all Interest Holders.  The Manager shall amend Exhibit A accordingly.  This remedy is in addition to any other remedies allowed by law or by this Agreement.

3.3.    No Interest on Capital Contributions.  Interest Holders shall not be paid interest on their Capital Contributions.

3.4.    <u>Return of Capital Contributions</u>.  Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive the return of any Capital Contribution.

3.5.    <u>Form of Return of Capital</u>.  If an Interest Holder is entitled to receive a return of a Capital Contribution, the Interest Holder shall not have the right to receive anything but Cash in return for the Interest Holder's Capital Contribution.

3.6.    <u>Capital Accounts</u>.  A separate Capital Account shall be maintained for each Interest Holder.

3.7.    <u>Loans</u>.  Any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Manager and such Member agree.

### Section IV.
### Profit, Loss, and Distributions

4.1.    <u>Distributions of Cash Flow and Allocations of Profit or Loss Other Than Capital Transactions</u>.

4.1.1.    <u>Profit or Loss Other Than from a Capital Transaction</u>.  After giving effect to the special allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with provisions of Sections 4.2.1 and 4.2.2) shall be allocated to the Interest Holders in proportion to their Percentages.

4.1.2.    <u>Cash Flow</u>.  Cash Flow for each taxable year of the Company shall be distributed to the Interest Holders in proportion to their Percentages no later than seventy-five (75) days after the end of the taxable year.

4.2.    <u>Distributions of Capital Proceeds and Allocation of Profit or Loss from Capital Transactions</u>.

4.2.1.    <u>Profit</u>.  After giving effect to the special allocations set forth in Section 4.3, Profit from a Capital Transaction shall be allocated as follows:

4.2.1.1.    If one or more Interest Holders has a Negative Capital Account, to those Interest Holders, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been reduced to zero.

4.2.1.2.    Any Profit not allocated to reduce Negative Capital Accounts to zero pursuant to Section 4.2.1.1 shall be allocated to the Interest Holders in proportion to, and to the extent of, the amounts distributable to them pursuant to Sections 4.2.3.4.1 and 4.2.3.4.3.



4.2.1.3.        Any Profit in excess of the foregoing allocations shall be allocated to the Interest Holders in proportion to their Percentages.

4.2.2.   Loss. After giving effect to the special allocations set forth in Section 4.3, Loss from a Capital Transaction shall be allocated as follows:

4.2.2.1.        If one or more Interest Holders has a Positive Capital Account, to those Interest Holders, in proportion to their Positive Capital Accounts, until all of those Positive Capital Accounts have been reduced to zero.

4.2.2.2.        Any Loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 4.2.2.1 shall be allocated to the Interest Holders in proportion to their Percentages.

4.2.3.   Capital Proceeds. Capital Proceeds shall be distributed and applied by the Company in the following order and priority:

4.2.3.1.        To the payment of all expenses of the Company incident to the Capital Transaction; then

4.2.3.2.        To the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Interest Holder); then

4.2.3.3.        To the establishment of any reserves which the Manager, in its sole discretion, deems necessary for liabilities or obligations of the Company; then

4.2.3.4.        The balance shall be distributed as follows:

4.2.3.4.1.        To the Interest Holders in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

4.2.3.4.2.        If any Interest Holder has a Positive Capital Account after the distributions made pursuant to Section 4.2.3.4.1 and before any further allocation of Profit pursuant to Section 4.2.1.3, to those Interest Holders in proportion to their Positive Capital Accounts; then

4.2.3.4.3.        The balance, to the Interest Holders in proportion to their Percentages.

4.3.   Regulatory Allocations.

4.3.1.   Qualified Income Offset. No Interest Holder shall be allocated Losses or deductions if the allocation causes an Interest Holder to have an Adjusted Capital Account Deficit. If an Interest Holder receives (1) an allocation of Loss or reduction (or

item thereof) or (2) any distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible.   This Section 4.3.1 is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.3.2.   Minimum Gain Chargeback.   Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Section IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this Section 4.3.2 shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year.   It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2 shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

4.3.3.   Contributed Property and Book-ups.   In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution).   If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder. The Manager shall determine the applicable method of applying Code Section 704(c) and the Regulations thereunder.

4.3.4.   Code Section 754 Adjustment.   To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the

Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3.5. <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages.

4.3.6. <u>Member Loan Nonrecourse Deductions</u>.  Any Member Loan Nonrecourse Deduction for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deduction is attributable in accordance with Regulation Section 1.704-2(i).

4.3.7. <u>Guaranteed Payments</u>.  To the extent any compensation paid to any Member by the Company, including any fees payable to any Member pursuant to Section 5.3 hereof, is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

4.3.8. <u>Unrealized Receivables</u>.  If an Interest Holder's Interest is reduced (provided the reduction does not result in a complete termination of the Interest Holder's Interest), the Interest Holder's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Interest Holder, be specially allocated among the Interest Holders in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture.  Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the Manager.

4.3.9. <u>Withholding</u>.  All amounts required to be withheld pursuant to Code Sections 1445 or 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

4.4. <u>Liquidation and Dissolution</u>.

4.4.1. If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to



Sections 4.1 or 4.2, if any, and distributions, if any, of cash or property, if any, pursuant to Sections 4.1 and 4.2.3.

4.4.2. No Interest Holder shall be obligated to restore a Negative Capital Account.

4.5.  <u>General</u>.

4.5.1. Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Manager.

4.5.2. If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest as tenant-in-common with all other Interest Holder so entitled. Unless the Members otherwise agree, the fair market value of such assets shall be determined by an independent appraiser who shall be selected by the Manager. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the distribution of the assets in liquidation pursuant to Section 4.4.

4.5.3. All Profit and Loss shall be allocated, and all distributions shall be made to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the forgoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit for Loss, or proceeds attributable to a Capital Transaction or to any other extraordinary nonrecurring items of the Company.

4.5.4. The Manager is hereby authorized, upon the advice of the Company's tax counsel, to amend this Section IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to an Interest Holder without the Interest Holder's prior written consent.



## Section V.
### Management: Rights, Power, and Duties

5.1.    Management.

5.1.1.    Manager.  Jignesh N. Pandya is hereby appointed the sole manager of the Company (the "Manager").   The Manager shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs.  No other Person shall have any right or authority to act for or bind the Company except as permitted in this Agreement, as required by law, or as expressly agreed to in writing by the Manager.

5.1.2.    General Powers.  The Manager shall have the full power to execute and deliver, for and on behalf of the Company, any and all documents and instruments which may be necessary or desirable to carry on the business of the Company, including, without limitation, any and all deeds, contracts, leases, mortgages, deeds of trust, promissory notes, security agreements, and financing statements pertaining to the Company's assets or obligations, and to authorize the confession of judgment against the Company.   No person dealing with the Manager need inquire into the validity or propriety of any document or instrument executed in the name of the Company by the Manager, or as to the authority of the Manager executing the same.

5.1.3.    Limitation on Authority of Members.

5.1.3.1.        No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member.  No Member (other than the Manager) shall take part in, or interfere in any manner with, the management, conduct or control of the business and affairs of the Company.

5.1.3.2.        Any Member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to any such loss or expense.

5.1.4.    Resignation of Manager.  The Manager may resign upon thirty (30) days written notice to the Members, after which notice the Members may elect a new Manager.

5.2.    Meetings of and Voting by Members.  Unless required by law, meetings of the Members need be held and there shall be no requirement for an annual meeting of the Members. Meetings, however, if held shall be governed by this Section 5.2.

5.2.1.   A meeting of the Members may be called at any time by the Manager or by those Members holding fifty-one percent (51%) or more of the Percentages then held by Members.   Meetings of Members shall be held at the Company's principal place of business or at any other place in Pennsylvania designated by the Person calling the meeting.   Not less than five (5) nor more than ninety (90) days before each meeting, the Person calling the meeting shall given written notice of the meeting to each Member entitled to vote at the meeting.   The notice shall state the time, place, and purpose of the meeting.   Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of the Members' meetings, or is present at the meeting in person or by proxy.   Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding fifty-one percent (51%) or more of the Percentages then held by Members constitutes a quorum.   A Member may vote either in person or by written proxy signed by the Member or by his duly authorized attorney-in-fact.

5.2.2.   Except as otherwise provided in this Agreement, the affirmative vote of Members holding fifty-one percent (51%) or more of the Percentages then held by Members shall be required to approve any matter coming before the Members.

5.2.3.   In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members holding fifty-one percent (51%) or more of the Percentages then held by Members.

5.2.4.   Except as otherwise provided in this Agreement, wherever the Law requires unanimous consent to approve or take any action, that consent shall be given in writing and, in all cases, shall mean, rather than the consent of all Members, the consent of Members holding fifty-one percent (51%) or more of the Percentages then held by Members.

5.3.   Personal Services.

5.3.1.   No Member shall be required to perform services for the Company solely by virtue of being a Member.   Unless approved by the Manager, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company.

5.3.2.   Upon the approval by Members holding fifty-one percent (51%) or more of the Percentages then held by Members, the Manager shall be entitled to compensation for services performed for the Company.   Upon substantiation of the amount and purpose thereof, the Manager shall also be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

5.4.   Duties of Parties.



5.4.1.  The Manager shall devote such time to the business and affairs of the Company as is necessary to carry out the Manager's duties set forth in this Agreement.

5.4.2.  Except as otherwise expressly provided in Section 5.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and the Member shall not be accountable to the Company or to any Member with respect to that business or activity even if the business or activity competes with the Company's business.  The organization of the Company shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates.

5.4.3.  Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates.  In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

5.5.    Liability and Indemnification.

5.5.1.  The Manager shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any services performed by the Manager within the scope of the authority conferred on the Manager by this Agreement, except for fraud or gross negligence.

5.5.2.  The Company shall indemnify the Manager for any act performed by the Manager within the scope of the authority conferred on the Manager by this Agreement, except for fraud or gross negligence.

5.6.    Power of Attorney.

5.6.1.  Grant of Power.  Each Member constitutes and appoints the Manager as the Member's true and lawful attorney-in-fact ("Attorney-in-Fact"), and in the Member's name, place and stead, to make, execute, sign, acknowledge, and file:

5.6.1.1.        one or more Articles of Organization;

5.6.1.2.        all documents (including amendments to the Articles of Organization) which the Attorney-in-Fact deems appropriate to reflect may amendment, change, or modification of this Agreement;

5.6.1.3.        any and all other certificates or other instruments required to be filed by the Company under the laws of the State of Connecticut or of any other state or jurisdiction, including, without limitation, any certificate or other

instruments necessary in order for the Company to continue to qualify as a limited liability company under the laws of the State of Connecticut;

        5.6.1.4.     one or more fictitious or trade name certificates; and

        5.6.1.5.     all documents which may be required to dissolve and terminate the Company and to cancel its Articles of Organization.

      5.6.2. Irrevocability. The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the death or disability of a Member. It also shall survive the Transfer of an Interest, except that if the transferee is approved for admission as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute, acknowledge, and file any documents needed to effectuate the substitution. Each Member shall be bound by any representations made by the Attorney-in-Fact pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate, or disaffirm the action of the Attorney-in-Fact taken under this power of attorney.

### Section VI.
### Transfer of Interests and Withdrawals of Members

6.1.    Restrictions on Transfer.

      6.1.1. Except as otherwise provided in this Agreement, no Member, other than Jignesh A. Pandya, may Transfer all, or any portion of, or any interest or rights in, the Membership Rights owned by the Member; and no Interest Holder may Transfer all, or any portion of, or any interest or rights in, any Interest without the prior written consent of the Manager. Each Member hereby acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members. The Transfer of any Membership Rights or Interests in violation of the prohibition contained in this Section 6.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Membership rights are attempted to be transferred in violation of this Section shall not (i) be entitled to vote on matters coming before the Members, (ii) participate in the management of the Company, (iii) act as an agent of the Company, (iv) receive distributions from the Company, or (v) have any other rights in or with respect to the Membership Rights.

      Jignesh A. Pandya shall be permitted to transfer his interest without the consent of any Member or Manager.

6.2.    Voluntary Withdrawal. No Member shall have the right or power to Voluntarily Withdraw from the Company without the prior written consent of the Manager.

6.3.    Optional Redemption in Event of Involuntary Withdrawal.

6.3.1. If the Members elect to continue the Company after an Involuntary Withdrawal, the Withdrawn Member shall be deemed to offer for sale (the "Withdrawal Offer") to the Company all of the Membership Rights owned of record and beneficially by the Withdrawn Member (the "Withdrawal Interest").

6.3.2. The Withdrawal Offer shall be and remain irrevocable for a period (the "Withdrawal Offer Period") ending at 11:59 p.m., local time, at the Company's principal office on the sixtieth (60th) day following the date the Members elect to continue the Company. At any time during the Withdrawal Offer Period, the Company may accept the Withdrawal Offer by notifying the Withdrawn Member (the "Withdrawal Notice") of its acceptance. The Withdrawn Member shall not be deemed a Member or Manager for the purpose of the vote on whether the Company shall accept the Withdrawal Offer.

6.3.3. If the Company accepts the Withdrawal Offer, the Withdrawal Notice shall fix a closing date (the "Withdrawal Closing Date") for the purchase which shall be not earlier than ten (10) or later than ninety (90) days after the expiration of the Withdrawal Period.

6.3.4. If the Company accepts the Withdrawal Offer, the Company shall purchase the Withdrawal Interest for a price equal to the Book Value, as defined in Section 6.7 (the "Withdrawal Purchase Price"). The Withdrawal Purchase Price shall be paid in cash on the Withdrawal Closing Date, unless the Remaining Members elect prior to or on the Withdrawal Closing Date to pay all or any portion of the Withdrawal Purchase Price in installments as provided in Section 6.5 of this Agreement.

6.3.5. If the Company fails to accept the Withdrawal Offer, then the Withdrawing Member or the Withdrawing Member's successor, as the case may be, upon the expiration of the Withdrawal Offer Period, thereafter shall be required to sell the Withdrawal Interest pursuant to Section 6.4.

6.4.   Mandatory Buy-out in Event of Involuntary Withdrawal.

6.4.1. If the Members elect to continue the Company after an Involuntary Withdrawal and the Company fails to accept the Withdrawal Offer pursuant to Section 6.3, the Members other than the Withdrawn Member ("Remaining Members") may purchase, and the Withdrawn Member shall sell the Withdrawal Interest for a price equal to the Withdrawal Purchase Price. In the absence of a contrary agreement among the Remaining Members, each Remaining Member may purchase the Withdrawal Interest in the proportion that his respective Percentage bears to the total Percentages of all of the Remaining Members.

6.4.2. The Remaining Members, by written notice addressed to the Withdrawn Member, shall fix the Withdrawal Closing Date for the purchase. The Withdrawal Closing Date shall not be earlier than ten (10) days or later than one hundred fifty (150) days after the later of the date on which the Involuntary Withdrawal occurred or the date on which the Company received notice of the Involuntary Withdrawal.



6.4.3. The Withdrawal Purchase Price shall be paid in cash on the Withdrawal Closing Date, unless the Remaining Members elect prior to or on the Withdrawal Closing Date to pay all or any portion of the Withdrawal Purchase Price in installments as provided in Section 6.5 of this Agreement. Simultaneously with the payment of the Withdrawal Purchase Price and/or the delivery of the Remaining Members' promissory notes to evidence their respective obligations to pay the Withdrawal Purchase Price, as applicable, the Withdrawn Member shall execute and deliver to the Remaining Members those assignments and other instruments as may be reasonably required to vest in the Remaining Members all right, title, and interest in and to the Withdrawal Interest, free and clear of all liens and encumbrances, including, but not limited to, the certificate or certificates evidencing the Withdrawal Interest, together with a power duly endorsed in blank for transfer of the Withdrawal Interest to the Remaining Members.

6.5     Installment Buy-outs. If the Company or the Remaining Members, as the case may be (the "Purchaser"), elect to pay all or any portion of the Withdrawal Purchase Price (the "Indebtedness") on an installment basis, the Purchaser shall pay the Indebtedness by executing and delivering its or their promissory note to the Withdrawn Member.

6.6     Call Option.

6.6.1   Each Member (other than the Manager) hereby unconditionally and irrevocably grants to the Company an exclusive option to purchase all or any portion of such Member's Membership Rights (the "Call Option"), at the Company's sole and absolute discretion, in accordance with the terms and conditions set forth in this Section 6.6.

6.6.2   Each Member hereby acknowledges and agrees that the Call Option may be exercised by the Company at any time, for any reason and in its sole and absolute discretion. Upon such exercise, the Company shall deliver a written notice to such Member that the Company has exercised the Call Option.

6.6.3   Should the Company exercise the Call Option, the purchase price to be paid by the Company for such Member's Interest (the "Call Option Purchase Price") shall be the Book Value determined in the manner set forth in Section 6.6.4, divided by the number of Interests outstanding less any amounts owed by such Member to the Company. The Company shall pay the Call Option Purchase Price to such Member in such manner as shall be determined by the Company in its sole and absolute discretion. Such Member shall execute and deliver any and all documents necessary to effectuate the transfer of such Member's Interest to the Company, including, but not limited to, the certificate or certificates evidencing such Member's Interest, together with an interest power duly endorsed in blank for transfer of the Interest to the Company.

6.6.4   Each Member hereby acknowledges and agrees that such Member shall have no put option with respect to such Member's Interest.



6.7.   <u>Book Value</u>.   The term "<u>Book Value</u>" means the book value of the respective Member's equity in the Company as of the end of the last full taxable year immediately preceding the year in which the event giving rise to the purchase and sale of the Membership Rights or Interest occurred.   Notwithstanding anything contained in this Agreement to the contrary, the computation of Book Value shall be subject to the following provisions:

6.7.1.   Book Value shall not include any proceeds collected or collectible by the Company, under any policy or policies of life or disability insurance insuring the life or disability of a Member, as a result of the death or disability of a Member.

6.7.2.   No additional allowance of any kind shall be made for the goodwill, trade names, or any other intangible asset or assets of the Company other than the aggregate dollar amount for any of those intangible assets appearing on the most recent balance sheet of the Company prior to the date on which Book Value is to be determined.

6.7.3.   Book Value shall be determined by the accountants regularly employed by the Company.   The determination by the accountants shall, for purposes of this Agreement, be final, conclusive, and binding upon each of the parties hereto.

## Section VII.
## Dissolution, Liquidation, and Termination of the Company

7.1.   <u>Events of Dissolution</u>.   The Company shall be dissolved upon the happening of any of the following events:

7.1.1.   When the period fixed for its duration in Section 2.4 has expired;

7.1.2.   Upon the unanimous written agreement of all of the Members;

7.1.3.   Upon the occurrence of an Involuntary Withdrawal of a Member, unless the remaining Members, within ninety (90) days after the occurrence of the Involuntary Withdrawal, unanimously elect to continue the business of the Company pursuant to the terms of this Agreement; or

7.1.4.   Upon the entry of an order of judicial dissolution under Section 8972 of the Law.

7.2.   <u>Procedure for Winding Up and Dissolution</u>.   If the Company is dissolved, the Manager shall wind up its affairs.   On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders and the Manager who are creditors, in satisfaction of the liabilities of the Company, and then to Interest Holders in accordance with Section 4.4.

7.3.   <u>Filing of Articles of Dissolution</u>.   If the Company is dissolved, the Manager shall file Articles of Dissolution with the Department of State of the State of Connecticut at the time

set forth in the Law. If there is no Manager, then the Articles of Dissolution shall be filed by the remaining Members; if there are no remaining Members, the Articles shall be filed by the last Person to be a Member; if there is neither a Manager, remaining Members, or a Person who last was a Member, the Articles shall be filed by the legal or personal representatives of the Person who last was a Member.

## Section VIII.
### Books, Records, Accounting, and Tax Elections

8.1.   <u>Bank Accounts</u>.  All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name. The Manager shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

8.2.   <u>Books and Records</u>.

8.2.1.   The Manager shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the Articles of Organization and this Agreement and all amendments to the Articles of Organization and this Agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state, or local tax returns.

8.2.2.   Except as set forth in Section 8.4, each Member hereby irrevocably waives any and all rights that such Member may have to receive information from, and to inspect the books and records of, the Company pursuant to the Law and any other laws applicable to the Company.

8.3.   <u>Annual Accounting Period</u>.  The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Manager, subject to the requirements and limitations of the Code.

8.4.   <u>Reports</u>.  Within seventy-five (75) days after the end of each taxable year of the Company, the Manager shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, such tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year.

8.5.   <u>Tax Matters Partner</u>.  The Manager shall be the Company's tax matters partner ("<u>Tax Matters Partner</u>"). If the Manager is not a Member, the Member designated by vote of a majority in interest of the Members shall serve as Tax Matters Partner. The Tax Matters Partner shall have all powers and responsibilities provided in Code Section 6231, *et seq*. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Partner in performing those duties.  A Member shall be responsible for any costs

incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Partner may compromise any dispute with the Internal Revenue Service without the approval of the Members.

8.6.   <u>Tax Elections</u>.   The Manager shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at the Manager's sole and absolute discretion.

8.7.   <u>Title to Company Property</u>.

8.7.1. Except as provided in Section 8.7.2, all real and personal property acquired by the Company shall be acquired and held by the Company in its name.

8.7.2. The Manager may direct that legal title to all or any portion of the Company's property be acquired or held in a name other than the Company's name. Without limiting the foregoing, the Manager may cause title to be acquired and held in its name or in the names of trustees, nominees, or straw parties for the Company. It is expressly understood and agreed that the manner of holding title to the Company's property (or any part thereof) is solely for the convenience of the Company, and all of that property shall be treated as Company property.

## Section IX.
## General Provisions

9.1.   <u>Assurances</u>.   Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

9.2.   <u>Notifications</u>.   Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested. Any notice to be given hereunder by the Company shall be given by the Manager. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.



9.3.   <u>Specific Performance</u>.   The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury.   Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4.   <u>Complete Agreement</u>.   This Agreement constitutes the complete and exclusive statement of the agreement among the Members.   It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty.   Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

9.5.   <u>Applicable Law</u>.   All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Connecticut.

9.6.   <u>Section Titles</u>.   The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

9.7.   <u>Binding Provisions</u>.   This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

9.8.   <u>Jurisdiction and Venue</u>.   Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court of Connecticut or any Connecticut court having jurisdiction over the subject matter of the dispute or matter.   All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

9.9.   <u>Terms</u>.   Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.

9.10.   <u>Separability of Provisions</u>.   Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

9.11.   <u>Estoppel Certificate</u>.   Each Member shall, within ten (10) days after written request by the Manager, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no



default hereunder by the requesting Person, or if there is a default, the nature and extent thereof. If the certificate is not received within that ten (10) day period, the Manager shall execute and deliver the certificate on behalf of the requested Member, without qualification, pursuant to the power of attorney granted in Section 5.6.

9.12.  <u>Counterparts</u>.  This Agreement may be executed by the parties hereto on any number of separate counterparts, and all such counterparts so executed constitute one agreement binding on all the parties hereto notwithstanding that all the parties hereto are not signatories to the same counterpart.  For purposes of this Agreement, a document (or signature page thereto) signed and transmitted by facsimile machine or portable document file ("<u>PDF</u>") is to be treated as an original document.  The signature of any party thereon is to be considered as an original signature, and the document transmitted is to be considered to have the same binding effect as an original signature on an original document.  At the request of any party hereto, any facsimile or PDF document is to be re-executed in original form by the parties who executed the facsimile or PDF document.  No party hereto may raise the use of a facsimile machine or PDF or the fact that any signature was transmitted through the use of a facsimile machine or by PDF as a defense to the enforcement of this Agreement or any amendment or other document executed in compliance with this Section 9.12.

**Section X.**

**Management Fee**

10.1  **Management Fee**.  The Manager is hereby authorized to enter into any management agreements for the operation of any of the Pizza Hut stores owned by the Company and pay a Management Fee for such services rendered, all in the sole discretion of the Managers.

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.


Jignesh N. Pandya


Kishan J. Patel

**Limited Liability Company**
**Operating Agreement**

**Exhibit A**
**List of Members and Percentages**

| Name and Address | Percentages |
|---|---|
| Jignesh N. Pandya<br>1471 Hidden Pond Drive<br>Yardley, PA 19067 | 75% |
| Kishan J. Patel<br>395 New Dover Road<br>Colonia, NJ  07067 | 25% |

