## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAGDISH PATEL and KISHAN PATEL, | |
| Plaintiffs/Counterclaim-Defendants, | |
| v. | Civil Action No. 14-cv-08127 (WJM) (MF) |
| JIGNESH PANDYA; KRUPA PATEL; JNP FOODS LLC; RONAK FOODS, LLC; ROHAN PROPERTIES, LLC; SHREE SIDDHIVINAYAK, LLC; HARIDRA, LLC; SRI PRATHAMESH, LLC; CT PIZZA, LLC; EDISON PIZZA, LLC; RONAK FOODS MANAGEMENT, LLC, ROHAN GROUP OF COMPANIES, JOHN/JANE DOES 1-10, and XYZ COMPANIES 1-10, | CIVIL ACTION |
| Defendants. | |

## DEFENDANTS' ANSWER AND DEFENSES TO PLAINTIFFS' AMENDED COMPLAINT AND AMENDED COUNTERCLAIMS AND AMENDED DESIGNATION OF TRIAL COUNSEL

Defendants Jignesh Pandya, Krupa Patel, JNP Foods, LLC, Ronak Foods, LLC, Rohan Properties, LLC, Shree Siddhivinayak, LLC, Haridra, LLC, SRI Prathamesh, LLC, CT Pizza, LLC, Edison Pizza, LLC, Ronak Foods Management, LLC, and Rohan Group of Companies (hereinafter sometimes referred to collectively as "Defendants"), by and through their counsel, answer the allegations in Plaintiffs' Amended Complaint as follows:

## INTRODUCTION

1.      Denied.

## PARTIES

2.      Plaintiffs are without sufficient information to admit or deny the allegations of this paragraph.

3.      Plaintiffs are without sufficient information to admit or deny the allegations of this paragraph.

4.      Admitted.

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.     Admitted.

11.     Admitted.

12.     Admitted.

13.     Admitted that Edison Pizza is not incorporated.  The remaining allegations of this paragraph are denied.

14.     Defendants are without sufficient information to admit or deny the allegations of this paragraph, except that the allegations in 14(a) are admitted and that Rohan Group does business at the address set forth in ¶14(b).

**JURISDICTION AND VENUE**

15.     This paragraph sets forth a conclusion of law to which no response is required.

To the extent a response is required, the allegations of this paragraph are denied.

16.     This paragraph sets forth a conclusion of law of which no response is required.

To the extent a response is required, the allegations of this paragraph are denied.

17.     This paragraph sets forth a conclusion to law of which no response is required.

To the extent a response is required, the allegations of this paragraph are denied.

**FACTS**

18.     Denied.

19.     Denied.

20.     Denied.

21.     Denied.

22.     Denied.

23.     Admitted that Mr. Pandya had never met Jagdish Patel prior to late 2010 and that the first meeting took place at a party held in New Jersey.

24.     Defendants are without sufficient information to admit or deny whether Jagdish Patel was "impressed" with Mr. Pandya.

25.     Admitted that Jagdish Patel informed Mr. Pandya at this first meeting that he would like to go into business with Mr. Pandya.  The remaining allegations of this paragraph are denied.

26.     Admitted that Mr. Pandya and Jagdish Patel ate together at restaurants and became friendly.  By way of further response, Jagdish Patel repeatedly requested meetings with Mr. Pandya during which he would repeated brag about his own success and offered his

3

influence to have Mr. Pandya appointed to a position in the Federation of India Association.  The remaining allegations of this paragraph are denied.

27.     Denied

28.     Admitted that Jagdish Patel visited Mr. Pandya's office in Pennsylvania. The remaining allegations of this paragraph are denied.

29.     Admitted that Mr. Pandya did not need partners.  The remaining allegations of this paragraph are denied.

30.     Denied.

31.     Denied as stated.  By way of further response, Jagdish Patel requested that Mr. Pandya allow sell part of his ownership interest in CT Pizza to his son Kishan Patel. Independent of this potential transaction, Mr. Pandya was negotiating with Pizza Hut to develop and open additional Pizza Hut locations in Connecticut in order to increase his foothold in the Connecticut market.  When Jagdish Patel learned of this, Jagdish Patel asked Mr. Pandya to allow him to be involved in the development of these new franchise locations and proclaimed to have an expertise in opening new franchise locations.  Jagdish Patel promised to contribute funds needed for the new locations if Mr. Pandya would allow it.

32.     Denied as stated.  By way of further response, the parties agreed that Mr. Pandya would own 75% of CT Pizza and that Kishan Patel would own 25%.

33.     Denied.

34.     Denied.  By way of further response, the Patels had full and complete access to all records of the locations to be purchased and performed their own due diligence, a fact that Jagdish Patel confirmed in writing.

35.   Admitted that Mr. Pandya e-mailed to Jagdish Patel a proforma that had been prepared by a third party for the nine existing Pizza Hut franchises that CT Pizza was considering acquiring.  The remaining allegations of this paragraph are denied.

36.   The allegations of this paragraph refer to a writing prepared by a third party, the terms of which speak for themselves.

37.   Denied.  By way of further response, the Patels had full and complete access to all records of the locations to be purchased and performed their own due diligence, a fact that Jagdish Patel confirmed in writing.

38.   Denied as stated.  By way of further response, Mr. Pandya offered to Jagdish Patel, after CT Pizza purchased the franchise locations, that he could contact Krupa Patel if he had any questions.

39.   Denied.

40.   Denied.

41.   Denied.

42.   Denied.

43.   Admitted that the Patels agreed that Kishan Patel would become a member of CT Pizza.  The remaining allegations of this paragraph are denied.

44.   Admitted that Mr. Pandya formed CT Pizza.  The remaining allegations of this paragraph are denied.

45.   Denied.

46.   Admitted that Kishan Patel wrote a check that was used to partially fund his purchase of a 25% membership interest in CT Pizza.  The remaining allegations of this paragraph are denied.

47.     Denied as stated. By way of further response, Plaintiffs' payment of $350,000 was used to partially fund Kishan Patel's purchase of a 25% interest in CT Pizza.

48.     Denied.

49.     Denied.

50.     Denied.

51.     Admitted that, consistent with disclosures in the Operating Agreement, CT Pizza retained a management company owned by Mr. Pandya to manage Pizza Hut franchise locations owned by CT Pizza. The remaining allegations of this paragraph are denied.

52.     Denied.

53.     Admitted.

54.     Denied.

55.     Denied.

56.     Denied.

57.     Denied. By way of further response, the Patels' legal counsel, Max Rutkanski, is handled the issues related to the liquor license transfers and, upon information and belief, reported directly to the Patels on these issues.

58.     Denied.

59.     Denied.

60.     Denied as stated. By way of further response, funds were wire transferred in or around August 2011 to complete Kishan Patel's purchase of a 25% interest in CT Pizza. Upon information and belief, those funds were transferred from an account in the name of Sweta Patel.

61.     Denied.

62.     Denied as stated.  By way of further response, when Jagdish Patel learned that Mr. Pandya intended to attend a Pizza Hut convention, Jagdish Patel stated that he wanted to attend.  Mr. Pandya advised Jagdish Patel that because Mr. Patel was not an owner, he did not see the purpose in this desired attendance.  Mr. Patel continued to pursue the issue, stating that he wanted to attend because he could not attend other conventions and wanted to feel good about himself.  After Jagdish Patel's relentless efforts, Mr. Pandya agreed to take Jagdish Patel as his guest.

63.     Denied.  By way of further response, Jagdish Patel learned that Mr. Pandya was communicating with Mr. McCoy about the possibility of purchasing Pizza Hut franchise locations in New Jersey.  Jagdish Patel then pursued Mr. Pandya and repeatedly stated that he desired to be an owner in New Jersey so that he could restore his credibility and reputation in the community.

64.     Denied.

65.     Defendants are without sufficient information to admit or deny the allegations of this paragraph.

66.     Admitted that Mr. Pandya saw Mr. McCoy at the convention and pointed him out to Jagdish Patel.  The remaining allegations of this paragraph are denied.

67.     Admitted that Mr. Pandya spoke with Mr. McCoy at a Pizza Hut Convention.  The remaining allegations of this paragraph are denied.

68.     Admitted that Mr. Pandya spoke with Mr. McCoy at a Pizza Hut Convention.  The remaining allegations of this paragraph are denied.

69.     Admitted that Mr. Pandya had a conversation with Hal McCoy at a Pizza Hut Convention.  Plaintiff is without sufficient information to admit or deny the remaining allegations of this paragraph.

70.     Denied.

71.     Denied.

72.     Denied.

73.     Denied.

74.     Admitted that Mr. Pandya performed due diligence on the potential to purchase Pizza Hut franchises in New Jersey and provided information to Plaintiffs.  The remaining allegations of this paragraph are denied.

75.     Denied.

76.     Admitted that Jagdish Patel expressed a desire to jointly own an entity with Mr. Pandya that would acquire Pizza Hut franchises in New Jersey.  The remaining allegations of this paragraph are denied.

77.     The allegations of this paragraph refer to a writing, the terms of which speak for themselves.

78.     The allegations of this paragraph refer to a writing, the terms of which speak for themselves.

79.     Denied as stated.  By way of further response, Jagdish Patel gave Mr. Pandya a check in the amount of $295,000 with instructions that the funds could be applied to CT Pizza if needed.  Jagdish Patel subsequently sent Mr. Pandya an e-mail stating he would invest $1 million in a New Jersey venture if it came to fruition.

8

80.    Admitted that Jagdish Patel stated that he would like to own a percentage that was larger than 25% if the parties were able to acquire Pizza Hut franchises in New Jersey.

81.    Denied as stated.  By way of further response, the parties discussed what the ownership percentage might be if they were to acquire Pizza Hut franchise locations in New Jersey.  That deal never finalized.

82.    Denied as stated.  By way of further response, Jagdish Patel gave a check for $185,000 to Mr. Pandya with instructions that the funds could be used for CT Pizza.

83.    Denied as stated.  By way of further response, Jagdish Patel gave a check for $185,000 to Mr. Pandya with instructions that the funds could be used for CT Pizza.

84.    Denied.

85.    Admitted that Edison Pizza was not incorporated.  The remaining allegations of this paragraph are denied.

86.    Admitted that neither Mr. Pandya nor Mr. Patel entered into a deal with Hal McCoy to acquire any Pizza Hut franchises in New Jersey.

87.    Admitted that Mr. Pandya never deposited money into the trust account of Robert Nathan, Esquire to acquire any Pizza Hut franchises in New Jersey.

88.    Denied.

89.    Denied.

90.    Admitted that Kishan Patel received $34,000 in dividends from CT Pizza in 2012. The remaining allegations of this paragraph are denied.

91.    Denied.

9

92.     Admitted that CT Pizza began losing money and that the company sought capital contributions from all members.  The remaining allegations of this paragraph are denied.

93.     Denied as stated.  By way of further response, CT Pizza suffered losses due to a fire at the West Hartford location and Hurricane Sandy, which disrupted business and caused damages.  In addition, Mr. Pandya advised the Patels that the store locations needed to be remodeled and monies spent to attract customers.  Mr. Pandya further advised the Patels that competition in the area had stepped up, which Mr. Pandya believed required building additional locations so that customers would see more Pizza Hut locations in the region.  The remaining allegations of this paragraph are denied.

94.     Admitted that at certain times Plaintiffs made demands to review financial records and that those records were made available.  The remaining allegations of this paragraph are denied.

95.     Denied.

96.     Denied.

97.     Denied.

98.     Denied.

99.     Denied.

100.    Denied.

101.    Admitted that Plaintiffs have requested copies of various CT Pizza records.  The remaining allegations of this paragraph are denied.

102.    Denied.

103.    Admitted that Plaintiffs made unjustified demand for the return of certain monies.  The remaining allegations of this paragraph are denied.

104.   Admitted that Mr. Pandya justifiably declined to return money to the Patels because there was no basis to return it.

105.   Denied.

106.   Denied.

107.   Denied.

108.   Admitted that Plaintiffs made unjustified demand for return of certain monies and that Mr. Pandya justifiably declined to do so because there was no basis to return it.  The remaining allegations of this paragraph are denied.

109.   Denied.

110.   Denied.

111.   Denied.

112.   Denied.

113.   Admitted that some of the entities identified in paragraph 109 have common ownership.  The remaining allegations of this paragraph are denied.

## FIRST CLAIM FOR RELIEF
### (Fraud)

114.   Defendants repeat the responses to the preceding paragraphs as if fully set forth herein.

115.   Denied.

116.   Denied.

117.   Denied.

118.   Denied.

119.   Denied.

120.   Denied.

11

## SECOND CLAIM FOR RELIEF
### (Federal RICO)

121.    Defendants repeat the responses to the preceding paragraphs as if fully set forth

herein.

122.    Denied.

123.    Denied.

124.    Denied.

125.    Denied.

126.    Denied.

127.    Denied.

128.    Denied.

129.    Denied.

130.    Denied.

131.    Denied.

132.    Denied.

## THIRD CLAIM FOR RELIEF
### (New Jersey RICO)

133.    Defendants repeat the responses to the preceding paragraphs as if fully set forth

herein.

134.    Denied.

135.    Denied.

136.    Denied.

137.    Denied.

138.    Denied.

139.   Denied.

140.   Denied.

141.   Denied.

142.   Denied.

## FOURTH CLAIM FOR RELIEF
### (Fraudulent Inducement)

143.   Defendants repeat the responses to the preceding paragraphs as if fully set forth herein.

144.   Denied.

145.   Denied.

146.   Denied.

147.   Denied.

148.   Denied.

149.   Denied.

## FIFTH CLAIM FOR RELIEF
### (Negligent Misrepresentation)

150.   Defendants repeat the responses to the preceding paragraphs as if fully set forth herein.

151.   Denied.

152.   Denied.

153.   Denied.

154.   Denied.

## SIXTH CLAIM FOR RELIEF
**(Conversion)**

155.   Defendants repeat the responses to the preceding paragraphs as if fully set forth herein.

156.   Denied.

157.   Denied.

158.   Denied.

159.   Denied.

160.   Denied.

## SEVENTH CLAIM FOR RELIEF
**(Breach of Contract)**

161.   Defendants repeat the responses to the preceding paragraphs as if fully set forth herein.

162.   Denied.

163.   Denied.

164.   Denied.

165.   Denied.

166.   Denied.

167.   Denied.

## EIGHTH CLAIM FOR RELIEF
**(Breach of Contract - - Liquor License)**

168.   Defendants repeat the responses to the preceding paragraphs as if fully set forth herein.

169.   Denied.

170.   Denied.

171.   Denied.

172.   Denied.

173.   Denied.

## NINTH CLAIM FOR RELIEF
### (Breach of Contract - - Edison Pizza)

174.   Defendants repeat the responses to the preceding paragraphs as if fully set forth herein.

175.   Denied.

176.   Denied

177.   Denied

178.   Denied

179.   Denied.

180.   Denied.

**WHEREFORE** Defendants demand judgment against Plaintiffs dismissing all claims with prejudice including Defendants attorneys' fees, costs of suit and interest, and such other an further relief as the court may deem just and equitable.

## SEPARATE AND AFFIRMATIVE DEFENSES

1.   The Complaint fails to state a claim upon which relief may be granted.

2.   Defendants performed and/or discharged each and every duty, if any, that they owed to Plaintiffs.

3.   Plaintiffs' claims are barred by the doctrine of waiver.

4.   Plaintiffs' claims are barred by the statute of frauds.

5.   Plaintiffs' claims are barred by the doctrines of accord and satisfaction.

15

6. Plaintiffs' claims are barred by the doctrine of illegality.

7. Plaintiffs' claims are barred by the doctrine of laches.

8. Plaintiffs' claims are barred by the statute of limitations.

9. Plaintiffs' claims are barred by the doctrine of estoppel.

10. The liability of Defendants, if any, is reduced by monies paid to Plaintiffs by collateral sources.

11. The obligation of Defendants, if any, are defined and limited by contract.

12. Plaintiffs' claims are barred or recovery reduced due to Plaintiffs' failure to mitigate damages.

13. Plaintiffs' losses and damages, if any, were caused by one or more superseding causes.

14. Plaintiffs' losses and damages, if any, resulted from circumstances and conditions beyond the control of Defendants.

15. Some or all Plaintiffs lack standing to bring their alleged claims for relief.

16. The amount of Plaintiffs' damages, if any, are offset by the amount of damages Plaintiffs have caused to Defendants.

17. Plaintiffs losses and damages, if any, were caused by third parties over whom Defendants exercised no control.

18. Defendants' claims are barred by their own misconduct and/or the breaches of their own duties to Plaintiff.

19. Defendants' claims are barred by the doctrine of unclean hands.

20. Defendants have suffered no damages, losses or other injuries.

16

21.    Defendants' damages, if any, were caused in whole or in part by their own conduct.

22.    Defendants have not taken any actions that warrant the imposition of punitive damages.

23.    Some of Plaintiffs' claims are directly contradicted by contrary provisions in the Operating Agreement for CT Pizza, which contains a valid and enforceable integration clause.

24.    Plaintiff's answers and defenses are based upon currently available information. Plaintiff reserves the right to amend these answers and Defendants as discovery progresses.

25.    Any allegations not specifically admitted above are denied.

## AMENDED COUNTERCLAIMS

Counterclaim Plaintiffs, Jignesh Pandya and CT Pizza, LLC ("CT Pizza") (sometimes collectively referred to herein collectively as "Counterclaim Plaintiffs"), by and through their attorneys, Archer & Greiner, P.C., hereby submit the following Amended Counterclaims against the Counterclaim-Defendants, Jagdish Patel ("Jagdish") and Kishan Patel ("Kishan") (sometimes collectively referred to herein collectively as the "Patels" or "Counterclaim Defendants"), and, in support thereof, aver as follows:

### PARTIES

1.     Jignesh Pandya, is an adult individual and a resident of Pennsylvania, at 8 Woodland Road, Newtown, Pennsylvania, 18940.

2.     CT Pizza, is a Connecticut limited liability company.

3.     Upon information and belief, Jagdish Patel, is an adult individual and a resident of New Jersey, residing at 395 New Dover Road, Colonia, New Jersey 07067.

4.     Upon information and belief, Kishan Patel, is an adult individual and a resident of New Jersey, who resides at 395 New Dover Road, Colonia, New Jersey 07067.

### JURISDICTION AND VENUE

5.     Jurisdiction is founded upon 28 U.S.C. § 1322 in that Counterclaim-Plaintiffs are citizens of Connecticut and Pennsylvania, and Counterclaim-Defendants are citizens of the State of New Jersey thereby creating complete diversity of citizenship, and the amount in controversy exceeds the statutory minimum, exclusive of interest and costs.

6.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred in the District of New Jersey.

## FACTUAL BACKGROUND

7.      Mr. Pandya is a successful franchise restaurant owner.

8.      Through entities that he owns and operates, Mr. Pandya owns over 85 franchise restaurants in various states, including but not limited to franchise restaurants for Pizza Hut, Dunkin' Donuts, and Checkers.

9.      Throughout his career, Mr. Pandya has successfully acquired existing franchise restaurant locations and has also successfully developed new franchise locations.

10.     Mr. Pandya's successful ownership and operation of franchise restaurants have opened up additional franchising opportunities for him that would not be available to others who lack his experience and successful track record.

### *The Purchase of Nine Existing Pizza Hut Franchise Locations in Connecticut*

11.     In early 2011, Mr. Pandya became aware of a business opportunity to acquire nine existing Pizza Hut restaurants in Connecticut. At that time, Mr. Pandya was a respected franchise owner of other Pizza Hut locations, which enabled him to have the opportunity to purchase these stores.

12.     Mr. Pandya negotiated with the then-existing owner for the purchase of the nine existing Pizza Hut franchises in Connecticut.

13.     Mr. Pandya formed CT Pizza, LLC, a limited liability company of the State of Connecticut, as the entity through which he would acquire the nine Connecticut Pizza Hut locations.

14.     CT Pizza was originally established with Mr. Pandya as its only member and he originally maintained sole ownership of the entity.

15.    Mr. Pandya solely funded the formation of CT Pizza and he spent his own time and efforts to discover and pursue the potential purchase of the nine Pizza Hut franchise locations.

16.    Mr. Pandya was introduced for the first time to Jagdish Patel through a mutual friend.

17.    Jagdish Patel had learned of Mr. Pandya's success through mutual contacts and he approached Mr. Pandya and asked if he would be interested in going into business together.

18.    Jagdish Patel had previously been an owner of Dunkin' Donuts franchises, but had never been an owner of any Pizza Hut franchises and had no connections with Pizza Hut.

19.    Mr. Pandya was not looking for a partner at that time, and so no agreements were reached at their initial introductory meeting.

20.    Following the initial meeting, Jagdish Patel continued to pursue Mr. Pandya about doing business together and about including Mr. Patel's son, Kishan, as a potential owner. Jagdish Patel informed Mr. Pandya that he and his son had substantial money to invest.

21.    While Jagdish Patel was pursuing Mr. Pandya and trying to convince him to allow him and his son to acquire an ownership interest in a franchise venture with Mr. Pandya, Mr. Pandya continued on his own to pursue the potential purchase of the nine existing Pizza Hut franchises in Connecticut.  Neither Kishan Patel nor Jagdish Patel had any involvement in those negotiations.

22.    After several meetings, Jagdish Patel convinced Mr. Pandya to allow Kishan's son to become part owners of CT Pizza.  Although the ownership would be in the name of Kishan Patel, all or almost all of Mr. Pandya's communications were with Jagdish Patel.

23.     Mr. Pandya sold to Kishan Patel a 25% membership interest in CT Pizza in exchange for payment of $485,000.

24.     Jagdish Patel informed Mr. Pandya that he would arrange for the purchase price to be paid in two payments.  The first payment would be $350,000 and the balance would be paid later.  Mr. Pandya agreed to accept payment in this manner and moved forward believing that the Patels were operating in good faith.

25.     Jagdish Patel represented to Mr. Pandya that, in addition to the purchase price, the Patels had additional funds to contribute to CT Pizza as needed and that they would make whatever contributions were necessary, even though the membership interest would be held in the name of his son.

26.     Mr. Pandya reasonably relied on Jagnish Patel's representation of providing future capital when needed when he agreed to sell a 25% interest in CT Pizza to Kishan Patel.

27.     The parties also agreed to the terms of an Operating Agreement for CT Pizza.

28.     Kishan Patel executed CT Pizza's Amended and Restated Limited Liability Company Operating Agreement (the "Operating Agreement") on July 12, 2011, a true and correct copy of which is attached hereto as Exhibit "1."

29.     The Operating Agreement contains an integration clause which provides, among other things, that it "supercedes all prior written and oral statements, including any prior representation, statement, condition or warranty."

30.     In ¶10.1 of the Operating Agreement, Kishan Patel agreed that Mr. Pandya, as manager, had the discretion to employ a management company to operate any Pizza Hut stores that were owned by CT Pizza and he agreed in ¶5.4.3 that companies with which CT Pizza did business could be owned by one or more members.

31.     In paragraph 5.1.1 of the Operating Agreement, Kishan Patel agreed that Mr. Pandya would serve as manager and that he had full authority to "make all decisions affecting such business and affairs" of CT Pizza.

32.     In the Operating Agreement, Kishan Patel agreed that Mr. Pandya had the power to borrow money to carry on the business of CT Pizza.

33.     The Operating Agreement made clear that additional funds might be necessary to operate CT Pizza's business. Specifically, ¶ 3.2.1 provides in pertinent part:

> 3.2.1. If the Manager at any time or from time to time determines that the Company requires additional Capital Contributions, then the Manager shall give notice to each Member of (i) the total amount of additional Capital Contribution that is required, (ii) the reason the additional Capital Contribution is required, (iii) each Member's proportionate share of the total additional Capital Contribution (determined in accordance with this Section), and (iv) the date each Member's additional Capital Contribution is due and payable. A Member's proportionate share of the total additional Capital Contribution shall be equal to the product obtained by multiplying the Member's Percentage and the total additional Capital Contribution required. A Member's proportionate share shall be payable in cash or by certified check.

34.     The Patels acknowledged to Mr. Pandya that they knew that additional funds might be required of them at a later date if the franchise locations were acquired by CT Pizza.

35.     In ¶3.2.3 of the Operating Agreement, Kishan Patel agreed that his failure to contribute monies in response to a capital call could result in the reduction or loss of his membership interest.

36.     Jagdish Patel had specific knowledge of the terms of the Operating Agreement.

37.     Based in part on the Patel's promises to provide funding, Mr. Pandya continued the negotiations with the then-current owner of the nine existing Pizza Hut franchise restaurants to complete the potential purchase.

22

38.     To get the deal completed, CT Pizza had to rely on Mr. Pandya's established reputation as a successful Pizza Hut owner and his ability to provide the necessary guarantees that the Patels were unable to provide.  For example, Pizza Hut and the banks required Mr. Pandya to personally guarantee all loans and to personally guarantee the franchise agreement for CT Pizza, but they did not require the Patels to do so.  Mr. Pandya was also required to personally guarantee all property leases, but the Patels were not.  Mr. Pandya put himself at personal risk in providing these guarantees on behalf of CT Pizza.

39.     The Patels were not directly involved in the negotiations to acquire the nine Connecticut Pizza Hut franchises and never expressed an interest to do so.

40.     The Patels could not have acquired any Pizza Hut franchises on their own without Mr. Pandya's direct involvement and personal guarantees.

41.     Mr. Pandya kept the Patels fully abreast of the negotiations and the information provided to them by the sellers.

42.     Prior to the acquisition, the Patels had complete access to documents regarding the potential purchase of the nine Pizza Hut franchise locations.  For example, the Patels had complete access to the profit projections, profit and loss statements, leases, purchase agreements, liquor license, list of landlords and their waivers, W2s, inspection reports, and quarterly sales comparisons.

43.     The Patels were satisfied with the information they received.  By way of example, in an email dated June 1, 2011, Jagdish Patel wrote the following to Mr. Pandya: "I am looking forward to getting back into business!  After looking over the papers, i [sic] am very very motivated and excited with this fantastic chance.  Please let me know how we can go forward."

44.     Given Jagdish Patel's prior experience as a Dunkin' Donuts franchisee and owner of other businesses, the Patels were sophisticated purchasers.

45.     The Patels were specifically aware that the franchise restaurant business is risky and that there are no guarantees of success.

46.     Jagdish Patel was peculiarly aware of the risks inherent in franchise ownership because Dunkin' Donuts had terminated his ownership interest in his Dunkin' Donuts franchises. For these and other reasons, the Patels were keenly aware of the potential risks and rewards of franchise restaurant ownership.

47.     The Patels, at all times relevant, had the opportunity to ask for whatever information they deemed relevant and had the opportunity to back out of any potential deal if they were denied information they believed important for their consideration.

48.     The Patels repeatedly expressed their satisfaction with Mr. Pandya's handling of the negotiations and the due diligence process.

49.     Following the due diligence process, CT Pizza completed the purchase of the nine existing Connecticut Pizza Hut stores and began to operate them.

50.     Consistent with the Operating Agreement, CT retained a management company to conduct the day-to-day management of the nine franchise restaurants.

51.     CT Pizza retained Ronak Foods Management, LLC ("RFM") to serve as its management company.

52.     The Patels were, at all times, aware that CT Pizza retained RFM as its management company and they were aware at all times that RFM was owned by Mr. Pandya.

53.     The Patels did not express any objection to the retention of RFM.

54.     RFM hired various regional managers to manage the CT Pizza franchise restaurants.  Those managers served only the CT Pizza restaurants and no other restaurants managed by RFM.

55.     Initially, CT Pizza was financially successful and CT Pizza issued a dividend check to Kishan Patel, which Kishan Patel cashed.

56.     Mr. Pandya never took a dividend check from CT Pizza.

57.     Jagdish Patel sent numerous emails to Mr. Pandya thanking him for allowing Kishan Patel to be a member of CT Pizza.

58.     Throughout the operations of CT Pizza, Mr. Pandya has kept and continues to keep the Patels fully informed of the financial health of CT Pizza and the individual Pizza Hut locations.  By way of example, Mr. Pandya provides the Patels with profit and loss statements for each franchise restaurant, tax returns, and bank account statements.

59.     In addition, the Patels, at all times relevant, have had online access to CT Pizza's banking records.  The Patels still maintain this access today.

60.     Upon information and belief, the Patels have electronically accessed banking information for CT Pizza and continue to do so today.

61.     In addition, the Patels have had full time online access to the real time, point of sale electronic records for each of the Pizza Hut franchise locations from InfoSync, a Pizza Hut vendor.  These detailed online records include everything from real time sales information, to inventory purchases, to payroll.   In other words, every financial record for each restaurant has been and remains available to the Patels in real time.  The Patels still maintain this access today.

62.     Upon information and belief, the Patels have electronically accessed the CT Pizza point of sale information through InfoSync.

63.     The Patels never expressed an interest in actively operating CT Pizza and, in fact, never did so.

64.     After approximately one year of operation, CT Pizza encountered financial troubles and its cash flow was insufficient to pay its expenses.

65.     CT Pizza made capital calls to the members to fund the shortfall and to keep CT Pizza solvent.

66.     In addition, Jagdish Patel was informed of the need for additional funds for CT Pizza, which he had previously promised to make if additional funds were needed.

67.     The Patels failed to satisfy their proportionate share of the capital calls.

68.     In order to keep CT Pizza solvent, Mr. Pandya was forced to contribute more money than his proportionate share of the capital calls.

69.     To date, after the initial funding, Mr. Pandya has satisfied every capital call from CT Pizza.  By comparison, the Patels have not satisfied the required capital calls.

70.     Because the Patels have failed to satisfy the required capital calls, CT Pizza and Mr. Pandya have suffered damages.

71.     By way of example, CT Pizza would have benefitted from additional advertising, but the Patels' failure to meet the required capital calls resulted in CT Pizza not having sufficient funds to properly advertise and, therefore, CT Pizza did not receive the additional revenue that would have resulted from additional customers.

72.     In addition, the Patels' failure to meet the capital calls caused Mr. Pandya to lose other franchise opportunities.  Specifically, Mr. Pandya lost a significant opportunity in the Chicago market because Pizza Hut determined that the accounts receivable in CT Pizza were too high, which was a direct result of the Patels' failure to meet the required capital calls.

73. In addition, the Patels' failure to meet the required capital calls caused CT Pizza to not have sufficient funds to pay RFM for the management services provided to CT Pizza, which funds are due and owing to RFM from CT Pizza.

**_The 20-Location Development Agreement in Connecticut_**

74. In addition to the nine existing Pizza Hut franchise restaurants that CT Pizza purchased, Pizza Hut provided Mr. Pandya the opportunity to enter into a 20-location development agreement with Pizza Hut to develop a minimum of 16 additional Pizza Hut franchise locations in Connecticut.

75. In November 2011, with the consent of the Patels, Mr. Pandya signed a development agreement with Pizza Hut to construct and operate additional Pizza Hut franchises in Connecticut (the "Development Agreement").

76. At all times relevant, the Patels were aware of the terms of the Development Agreement.

77. Mr. Pandya provided a copy of the Development Agreement to Jagdish Patel.

78. Jagdish Patel promised to provide necessary funding to develop the additional stores and promised to help find additional locations.

79. Upon information and belief, Jagdish Patel traveled to Connecticut with his nephew (Nilesh Patel) to seek out potential locations to develop new stores. Jagdish Patel further stated that his brother would also assist in finding new locations.

80. Mr. Pandya invited Jagdish Patel to visit CT Pizza's existing locations and provided him with contact information for the district manager.

81.     Jagdish Patel came to Connecticut, where he met with the district manager and toured at least some of the existing CT Pizza locations.

82.     The opportunity to enter into the Development Agreement became available because of Mr. Pandya's past success as an owner and operator of other Pizza Hut franchises.

83.     The Patels would not have been able to enter into the Development Agreement without Mr. Pandya's involvement as the principal.

84.     As a result of the opportunities afforded by the Development Agreement, the members of CT Pizza were required to contribute additional capital to build and open the new restaurant locations.

85.     Jagdish Patel represented to Mr. Pandya that he had additional funds to contribute to CT Pizza pursuant to the Development Agreement to develop and open the new franchise locations as needed and that he would make whatever financial contributions were necessary.

86.     Mr. Pandya entered into the Development Agreement based in part on his reasonable reliance on the promises made by Patels to contribute the funds necessary to build the new franchise locations.

87.     Mr. Pandya put his reputation within Pizza Hut on the line when he executed the Development Agreement, which he did in part based on his reasonable reliance on the Patels' promises to fund the development of the new franchise locations.

88.     Pursuant to the Development Agreement, CT Pizza built two additional Pizza Hut franchise locations in Connecticut, which is far less than the minimum of 16 new locations set forth in the Development Agreement.

89.     CT Pizza has not built the additional stores set forth in the Development Agreement in part because the Patels have not contributed the funds required to build the stores.

90.    Despite the Patels' promises, the Patels did not contribute the funds necessary to develop the stores under the Development Agreement.

91.    As a direct and proximate result thereof, Mr. Pandya lost clout within Pizza Hut because CT Pizza failed to open all of the franchise contemplated by the Development Agreement and Counterclaim Plaintiffs lost the opportunity to profit from those franchise locations.

92.    At all times relevant, Jagdish Patel was the agent of Kishan Patel.

93.    At all times relevant, Kishan Patel was the agent of Jagdish Patel.

94.    Based upon his direct dealings and communications with the Patels, Mr. Pandya reasonably understood the Patels operated in tandem and that each had the express and/or implicit authority to bind the other.

## COUNT I
## (BREACH OF CONTRACT)

95.    Counterclaim Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

96.    Counterclaim Plaintiffs have satisfied all of their respective obligations under the Operating Agreement.

97.    As set forth above, Kishan Patel, individually and acting through his father, has breached the Operating Agreement by failing to meet the capital calls.

98.    As a direct and proximate result thereof, Mr. Pandya and CT Pizza have suffered damages, including but not limited to, lost sales opportunities that would have been afforded with additional advertising, lost opportunities under the Development Agreement, exposure to the personal guarantees, lost management fees, and lost opportunities with Pizza Hut in other

regions. Mr. Pandya has also been forced to contribute more funds to CT Pizza than his ownership share required because Kishan Patel did not meet the capital calls.

**COUNT II**
**(BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)**

99. Counterclaim Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

100. Kishan Patel owes Plaintiffs an implied duty of good faith and fair dealing.

101. By refusing to deal in good faith in his dealings with Mr. Pandya as described above, Kishan Patel breached the implied covenant of good faith and fair dealing.

102. As a direct and proximate result thereof, Plaintiffs have suffered damages.

**COUNT III**
**(FRAUD)**

103. Counterclaim Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

104. As explained above, both with respect to the original nine Pizza Hut franchises and the additional stores identified in the Development Agreement, Jagdish Patel represented to Mr. Pandya that he would contribute additional funds to CT Pizza as needed, even though the membership interest in CT Pizza would be held in the name of his son.

105. Upon information and belief, these representations were false when made and were made with the intent that Mr. Pandya would rely upon them and use his considerable clout with Pizza Hut to acquire the nine franchise restaurants and build new ones for CT Pizza and to sell a 25% interest in CT Pizza to Kishan Patel.

106.    Mr. Pandya relied on these representations when he agreed to sell a 25% membership interest in CT Pizza to Kishan Patel and when he executed the Development Agreement.

107.    Jagdish Patel made such false statements either intentionally and/or negligently with callous disregard for their truth.

108.    As a direct and proximate result thereof, Counterclaim Plaintiffs have suffered damages.

## COUNT IV
## (BREACH OF FIDUCIARY DUTY)

109.    Counterclaim Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

110.    As a member of CT Pizza, Kishan Patel owes Mr. Pandya the highest fiduciary duty.

111.    At all times, Mr. Pandya relied upon the Kishan Patel to act in the best interests of Pandya and CT Pizza.

112.    Through the actions outlined above, Kishan Patel breached his fiduciary duties to Mr. Pandya.

113.    As a direct and proximate result thereof, Plaintiffs have suffered damages.

## COUNT V
## (TORTIOUS INTERFERENCE WITH CONTRACT)

114.    Counterclaim Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

115.    At all times relevant, Jagdish Patel was aware of Mr. Pandya's rights under the Operating Agreement and the Development Agreement.

116.   At all times relevant, Kishan Patel was aware of Mr. Pandya's rights under the Development Agreement.

117.   Upon information and belief, Jagdish Pandya instructed and/or encouraged his son, Kishan Patel, not to comply with the terms of the Operating Agreement.

118.   Jagdish Patel was not justified in intentionally interfering with Mr. Pandya's rights under the Operating Agreement.

119.   Upon information and belief, the Patels conspired with each other not to contribute funds needed to develop and maintain the additional franchise locations that were the subject of the Development Agreement, thereby causing such stores not to be developed or maintained.

120.   The Patels' interference with Mr. Pandya's contract rights under the Development Agreement was not justified.

121.   As a direct and proximate result thereof, Plaintiffs have suffered damages.

## COUNT VI
## (CIVIL CONSPIRACY)

122.   Counterclaim Plaintiffs incorporate the allegations of the preceding paragraphs as if fully set forth herein.

123.   Defendants acted in concert with each other to commit the unlawful and tortious acts set forth above and below.

124.   Defendants knowingly and intentionally agreed to commit such acts in an effort to harm Plaintiffs.

125.    As a result of the foregoing overt actions committed by the Defendants acting in concert, Plaintiff has suffered damages.

**WHEREFORE**, Counterclaim Plaintiffs demand the following relief from Counterclaim-Defendants:

1.    Compensatory damages;

2.    Punitive damages;

3.    Pre- and post-judgment interest;

4.    Attorneys' fees and costs of suit; and

5.    Such other and further relief as the Court deems just and equitable.

> Respectfully submitted,
> ARCHER & GREINER
> A PROFESSIONAL CORPORATION
> Attorneys for Defendants/Counterclaim
> Plaintiffs
>
> By: /s/ Mark J. Oberstaedt_____
>        MARK J. OBERSTAEDT, ESQUIRE

Dated:  November 23, 2015

## AMENDED DESIGNATION OF TRIAL COUNSEL

Defendants designate Mark J. Oberstaedt, Esquire as trial counsel in the above-captioned

matter.

Respectfully submitted,

ARCHER & GREINER
A PROFESSIONAL CORPORATION
Attorneys for Defendants/Counterclaim
Plaintiffs

By: _/s/ Mark J. Oberstaedt_____
　　　MARK J. OBERSTAEDT, ESQUIRE

Dated:  November 23, 2015

113300039v1

34

# Exhibit 1

## AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY
## OPERATING AGREEMENT OF
## CT PIZZA, LLC

This Amended and Restated Limited Liability Company Operating Agreement (this "Agreement") is entered into this 12th day of July, 2011, by and among the signatories hereto.

### BACKGROUND

A.  On July 5, 2011 Articles of Organization for CT Pizza, LLC ("Company") were filed with the Connecticut Secretary of State in accordance with the Connecticut Limited Liability Company Act (Conn. Gen. Stat. Ann. 34-100 et seq.), as amended ("Law"), wherein Jignesh N. Pandya was the Sole Member.

B.  On July 12th, 2011 Jignesh N. Pandya sold twenty-five (25%) percent of his Membership Interest to Kishan J. Patel.

C.  Jignesh N. Patel and Kishan J. Patel agree that collectively they are the sole Members of the Company and desire to amend and restate the Limited Liability Company Agreement as more fully set forth herein.

NOW THEREFORE, intending to be legally bound, and incorporating the Background above, the parties agree as follows:

### Section I.
### Defined Terms

The following capitalized terms shall have the meanings specified in this Section I. Other terms are defined in the text of this Agreement; and, throughout this Agreement, those terms shall have the meanings respectively ascribed to them.

"Adjusted Capital Account Deficit" means, with respect to any Interest Holder, the deficit balance, if any, in the Interest Holder's Capital Account as of the end of the relevant taxable year, after giving effect to the following adjustments:

(i)  The deficit shall be decreased by the amounts which the Interest Holder is obligated to restore pursuant to Section 4.4.2, or is deemed obligated to restore pursuant to Regulation Section 1.704-1(b)(2)(ii)(c); and

(ii)  The deficit shall be increased by the items described in Regulation Section 1.704-1(b)(2)(ii)-(d)(4), (5), and (6).

"Adjusted Capital Balance" means, as of any day, an Interest Holder's total Capital Contributions less all amounts actually distributed to the Interest Holder pursuant to Sections

4.2.3.4.1 and 4.4 hereof. If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Adjusted Capital Balance of the transferor to the extent the Adjusted Capital Balance is attributable to the Interest transferred.

"Affiliate" means, with respect to any Member, any other Person that, directly or indirectly through one or more intermediaries, controls, is controlled by or is under common control with such specified Person. For purposes of this definition, the term "control" means the power to direct or cause the direction of the management of a Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlled" and "controlling" have correlative meanings.

"Agreement" means this Agreement, as amended from time to time.

"Capital Account" means the account to be maintained by the Company for each Interest Holder in accordance with the following provisions:

(i)    An Interest Holder's Capital Account shall be credited with the Interest Holder's Capital Contributions, the amount of any Company liabilities assumed by the Interest Holder (or which are secured by Company property distributed to the Interest Holder), the Interest Holder's distributive share of Profit and any item in the nature of income or gain specially allocated to such Interest Holder pursuant to the provisions of Section IV (other than Section 4.3.3); and

(ii)    An Interest Holder's Capital Account shall be debited with the amount of money and the fair market value of any Company property distributed to the Interest Holder, the amount of any liabilities of the Interest Holder assumed by the Company (or which are secured by property contributed by the Interest Holder to the Company), the Interest Holder's distributive share of Loss, and any item in the nature of expenses or losses specially allocated to the Interest Holder pursuant to the provisions of Section IV (other than Section 4.3.3).

If any Interest is transferred pursuant to the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent the Capital Account is attributable to the Interest transferred. If the book value of Company property is adjusted pursuant to Section 4.3.3, the Capital Account of each Interest Holder shall be adjusted to reflect the aggregate adjustment in the same manner as if the Company had recognized gain or loss equal to the amount of such aggregate adjustment. It is intended that the Capital Accounts of all Interest Holders shall be maintained in compliance with the provisions of Regulation Section 1.704-1(b), and all provisions of this Agreement relating to the maintenance of Capital Accounts shall be interpreted and applied in a manner consistent with that Regulation.

"Capital Contribution" means the total amount of cash and the fair market value of any other assets contributed (or deemed contributed under Regulation Section 1.704-1(b)(2)(iv)(d)) to the Company by a Member, net of liabilities assumed or to which the assets are subject.



"Capital Proceeds" means the gross receipts received by the Company from a Capital Transaction.

"Capital Transaction" means any transaction not in the ordinary course of business which results in the Company's receipt of cash or other consideration other than Capital Contributions, including, without limitation, proceeds of sales or exchanges or other dispositions of property not in the ordinary course of business, financings, refinancings, condemnations, recoveries of damage awards, and insurance proceeds.

"Cash Flow" means all cash funds derived from operations of the Company (including interest received on reserves), without reduction for any noncash charges, but less cash funds used to pay current operating expenses including, but not limited to, any management fees, and to pay or establish reasonable reserves for future expenses, debt payments, capital improvements, and replacements as determined by the Manager in its sole discretion. Cash Flow shall not include Capital Proceeds but shall be increased by the reduction of any reserve previously established.

"Code" means the Internal Revenue Code of 1986, as amended, or any corresponding provision of any succeeding law.

"Company" means the limited liability company formed in accordance with this Agreement.

"Interest" means a Person's share of the Profits and Losses of, and the right to receive distributions from, the Company.

"Interest Holder" means any Person who holds an Interest, whether as a Member or as an unadmitted assignee of a Member.

"Involuntary Withdrawal" means, with respect to any Member, the occurrence of any of the following events:

    (i)    The Member makes an assignment for the benefit of creditors;

    (ii)    The Member files a voluntary petition of bankruptcy;

    (iii)    The Member is adjudged bankrupt or insolvent or there is entered against the Member an order for relief in any bankruptcy or insolvency proceeding;

    (iv)    The Member files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation;

    (v)    The Member seeks, consents to, or acquiesces in the appointment of a trustee for, receiver for, or liquidation of the Member or of all or any substantial part of the Member's properties;

(vi)    The Member files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding described in Subsections (i) through (v);

(vii)   Any proceeding against the Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, continues for one hundred twenty (120) days after the commencement thereof, or the appointment of a trustee, receiver, or liquidator for the Member or all or any substantial part of the Member's properties without the Member's agreement or acquiescence, which appointment is not vacated or stayed for one hundred twenty (120) days or, if the appointment is stayed, for one hundred twenty (120) days after the expiration of the stay during which period the appointment is not vacated;

(viii)  If the Member is an individual, the Member's death or adjudication by a court of competent jurisdiction as incompetent to manage the Member's person or property;

(ix)    If the Member is acting as a Member by virtue of being a trustee of a trust, the termination of the trust;

(x)     If the Member is a partnership or another limited liability company, the dissolution and commencement of winding up of the partnership or limited liability company;

(xi)    If the Member is a corporation, the dissolution of the corporation or the revocation of its charter; or

(xii)   If the Member is an estate, the distribution by the fiduciary of the estate's entire interest in the limited liability company.

"Law" means the Connecticut Limited Liability Company Law, Conn. Gen. Stat. Ann. 34-100 et seq., as amended from time to time.

"Manager" is the Person designated as such in Section V.

"Member" means each Person signing this Agreement and any Person who subsequently is admitted as a member of the Company.

"Member Loan Nonrecourse Deductions" means any Company deductions that would be Nonrecourse Deductions if they were not attributable to a loan made or guaranteed by a Member within the meaning of Regulation Section 1.704-2(i).

"Membership Rights" means a Member's Interest and a Member's right to vote on matters coming before the Company that require the approval of the Members.



V.P

"Minimum Gain" has the meaning set forth in Regulation Section 1.704-2(d). Minimum Gain shall be computed separately for each Interest Holder in a manner consistent with the Regulations under Code Section 704(b).

"Negative Capital Account" means a Capital Account with a balance of less than zero.

"Nonrecourse Deductions" has the meaning set forth in Regulation Section 1.704-2(b)(1). The amount of Nonrecourse Deductions for a taxable year of the Company equals the net increase, if any, in the amount of Minimum Gain during that taxable year, determined according to the provisions of Regulation Section 1.704-2(c).

"Nonrecourse Liability" means any liability of the Company with respect to which no Member has personal liability determined in accordance with Code Section 752 and the Regulations promulgated thereunder.

"Percentage" means, as to a Member, the percentage set forth after the Member's name on Exhibit A, as amended from time to time, and as to an Interest Holder who is not a Member, the Percentage of the Member whose Interest has been acquired by such Interest Holder, to the extent the Interest Holder has succeeded to that Member's Interest.

"Person" means and includes any individual, corporation, partnership, association, limited liability company, trust, estate, or other entity.

"Positive Capital Account" means a Capital Account with a balance greater than zero.

"Profit" and "Loss" mean, for each taxable year of the Company (or other period for which Profit or Loss must be computed) the Company's taxable income or loss determined in accordance with Code Section 703(a), with the following adjustments:

     (i)     All items of income, gain, loss, deduction, or credit required to be stated separately pursuant to Code Section 703(a)(1) shall be included in computing taxable income or loss;

     (ii)     Any tax-exempt income of the Company, not otherwise taken into account in computing Profit or Loss, shall be included in computing taxable income or loss;

     (iii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) (or treated as such pursuant to Regulation Section 1.704(b)(2)(iv)(i)) and not otherwise taken into account in computing Profit or Loss, shall be subtracted from taxable income or loss;

     (iv)     Gain or loss resulting from any taxable disposition of Company property shall be computed by reference to the adjusted book value of the property disposed of, notwithstanding the fact that the adjusted book value differs from the adjusted basis of the property for federal income tax purposes;



    (v)    In lieu of the depreciation, amortization, or cost recovery deductions allowable in computing taxable income or loss, there shall be taken into account the depreciation computed based upon the adjusted book value of the asset; and

    (vi)    Notwithstanding any other provision of this definition, any items which are specially allocated pursuant to Section 4.3 hereof shall not be taken into account in computing Profit or Loss.

"Regulation" means the income tax regulations, including any temporary regulations, from time to time promulgated under the Code.

"Transfer" means, when used as a noun, any voluntary sale, hypothecation, pledge, assignment, attachment, or other transfer; and, when used as a verb, means, voluntarily to sell, hypothecate, pledge, assign, or otherwise transfer.

"Voluntary Withdrawal" means a Member's dissociation with the Company by means other than by a Transfer or an Involuntary Withdrawal.

## Section II.
## Formation and Name: Office; Purpose; Term

2.1.    <u>Organization</u>.  The parties shall organize a limited liability company pursuant to the Law and the provisions of this Agreement and, for that purpose, shall cause Articles of Organization, in the form prescribed by the Connecticut Department of State, to be executed and filed for record with the Connecticut Department of State.

2.2.    <u>Name of the Company</u>.  The name of the Company shall be CT Pizza, LLC.  The Company may do business under that name and under any other name or names which the Manager selects.

2.3.    <u>Purpose</u>.  The Company is formed for the purpose of engaging in any lawful business, purpose or activity for which limited liability companies may be formed under the Law including, but not limited to, the purchase and operation of nine (9) Pizza Hut stores in Connecticut.  The Company shall possess and may exercise all of the powers and privileges granted by the Law or by any other law or by this Agreement, together with any powers incidental thereto, so far as such powers and privileges are necessary or convenient to the conduct, promotion or attainment of the business purposes or activities of the Company.

2.4.    <u>Term</u>.  The term of the Company shall begin upon the filing of the Articles of Organization with the Connecticut Department of State and shall continue in existence until its existence is sooner terminated pursuant to Section VII of this Agreement.

2.5.    <u>Registered Office; Principal Office</u>.  The registered agent in the State of Connecticut in Business Filings Incorporated with an address of One Corporate Center 11th Floor, Hartford, CT  06103 and the principal place of business of the Company shall be located

at 210 E. Street Road, Suite 3B, Feasterville, PA 19053, or such other place or places as the Manager may select.

2.6.  Members.  The name, present mailing address, and Percentage of each Member are set forth on Exhibit A.

### Section III.
### Members; Capital; Capital Accounts

3.1.  Initial Capital Contributions.  Upon the execution of this Agreement, the Members shall contribute to the Company cash and other consideration as agreed to by the Members.

3.2.  Additional Capital Contributions.

3.2.1.  If the Manager at any time or from time to time determines that the Company requires additional Capital Contributions, then the Manager shall give notice to each Member of (i) the total amount of additional Capital Contribution that is required, (ii) the reason the additional Capital Contribution is required, (iii) each Member's proportionate share of the total additional Capital Contribution (determined in accordance with this Section), and (iv) the date each Member's additional Capital Contribution is due and payable.  A Member's proportionate share of the total additional Capital Contribution shall be equal to the product obtained by multiplying the Member's Percentage and the total additional Capital Contribution required.  A Member's proportionate share shall be payable in cash or by certified check.

3.2.2.  Except as provided in Section 3.2.1, no Member shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any obligation of the Company.

3.2.3.  If a Member fails to pay when due all or any portion of any Capital Contribution, the Manager shall request the non-defaulting Members to pay the unpaid amount of the defaulting Member's Capital Contribution (the "Unpaid Contribution").  To the extent the Unpaid Contribution is contributed by any other Member, the defaulting Member's Percentage shall be reduced and the Percentage of each Member who makes up the Unpaid Contribution shall be increased, so that each Member's Percentage is equal to a fraction, the numerator of which is that Member's total Capital Contribution and the denominator of which is the total Capital Contributions of all Interest Holders.  The Manager shall amend Exhibit A accordingly.  This remedy is in addition to any other remedies allowed by law or by this Agreement.

3.3.  No Interest on Capital Contributions.  Interest Holders shall not be paid interest on their Capital Contributions.

3.4.   Return of Capital Contributions.  Except as otherwise provided in this Agreement, no Interest Holder shall have the right to receive the return of any Capital Contribution.

3.5.   Form of Return of Capital.  If an Interest Holder is entitled to receive a return of a Capital Contribution, the Interest Holder shall not have the right to receive anything but Cash in return for the Interest Holder's Capital Contribution.

3.6.   Capital Accounts.   A separate Capital Account shall be maintained for each Interest Holder.

3.7.   Loans.  Any Member may, at any time, make or cause a loan to be made to the Company in any amount and on those terms upon which the Manager and such Member agree.

## Section IV.
### Profit, Loss, and Distributions

4.1.   Distributions of Cash Flow and Allocations of Profit or Loss Other Than Capital Transactions.

4.1.1.   Profit or Loss Other Than from a Capital Transaction.  After giving effect to the special allocations set forth in Section 4.3, for any taxable year of the Company, Profit or Loss (other than Profit or Loss resulting from a Capital Transaction, which Profit or Loss shall be allocated in accordance with provisions of Sections 4.2.1 and 4.2.2) shall be allocated to the Interest Holders in proportion to their Percentages.

4.1.2.   Cash Flow.  Cash Flow for each taxable year of the Company shall be distributed to the Interest Holders in proportion to their Percentages no later than seventy-five (75) days after the end of the taxable year.

4.2.   Distributions of Capital Proceeds and Allocation of Profit or Loss from Capital Transactions.

4.2.1.   Profit.  After giving effect to the special allocations set forth in Section 4.3, Profit from a Capital Transaction shall be allocated as follows:

4.2.1.1.     If one or more Interest Holders has a Negative Capital Account, to those Interest Holders, in proportion to their Negative Capital Accounts, until all of those Negative Capital Accounts have been reduced to zero.

4.2.1.2.     Any Profit not allocated to reduce Negative Capital Accounts to zero pursuant to Section 4.2.1.1 shall be allocated to the Interest Holders in proportion to, and to the extent of, the amounts distributable to them pursuant to Sections 4.2.3.4.1 and 4.2.3.4.3.



4.2.1.3.        Any Profit in excess of the foregoing allocations shall be allocated to the Interest Holders in proportion to their Percentages.

4.2.2.  Loss.  After giving effect to the special allocations set forth in Section 4.3, Loss from a Capital Transaction shall be allocated as follows:

4.2.2.1.        If one or more Interest Holders has a Positive Capital Account, to those Interest Holders, in proportion to their Positive Capital Accounts, until all of those Positive Capital Accounts have been reduced to zero.

4.2.2.2.        Any Loss not allocated to reduce Positive Capital Accounts to zero pursuant to Section 4.2.2.1 shall be allocated to the Interest Holders in proportion to their Percentages.

4.2.3.  Capital Proceeds.  Capital Proceeds shall be distributed and applied by the Company in the following order and priority:

4.2.3.1.        To the payment of all expenses of the Company incident to the Capital Transaction; then

4.2.3.2.        To the payment of debts and liabilities of the Company then due and outstanding (including all debts due to any Interest Holder); then

4.2.3.3.        To the establishment of any reserves which the Manager, in its sole discretion, deems necessary for liabilities or obligations of the Company; then

4.2.3.4.        The balance shall be distributed as follows:

4.2.3.4.1.        To the Interest Holders in proportion to their Adjusted Capital Balances, until their remaining Adjusted Capital Balances have been paid in full;

4.2.3.4.2.        If any Interest Holder has a Positive Capital Account after the distributions made pursuant to Section 4.2.3.4.1 and before any further allocation of Profit pursuant to Section 4.2.1.3, to those Interest Holders in proportion to their Positive Capital Accounts; then

4.2.3.4.3.        The balance, to the Interest Holders in proportion to their Percentages.

4.3.    Regulatory Allocations.

4.3.1.  Qualified Income Offset.  No Interest Holder shall be allocated Losses or deductions if the allocation causes an Interest Holder to have an Adjusted Capital Account Deficit.  If an Interest Holder receives (1) an allocation of Loss or reduction (or

item thereof) or (2) any distribution, which causes the Interest Holder to have an Adjusted Capital Account Deficit at the end of any taxable year, then all items of income and gain of the Company (consisting of a pro rata portion of each item of Company income, including gross income and gain) for that taxable year shall be allocated to that Interest Holder, before any other allocation is made of Company items for that taxable year, in the amount and in proportions required to eliminate the excess as quickly as possible. This Section 4.3.1 is intended to comply with, and shall be interpreted consistently with, the "qualified income offset" provisions of the Regulations promulgated under Code Section 704(b).

4.3.2. <u>Minimum Gain Chargeback</u>. Except as set forth in Regulation Section 1.704-2(f)(2), (3), and (4), if, during any taxable year, there is a net decrease in Minimum Gain, each Interest Holder, prior to any other allocation pursuant to this Section IV, shall be specially allocated items of gross income and gain for such taxable year (and, if necessary, subsequent taxable years) in an amount equal to that Interest Holder's share of the net decrease of Minimum Gain, computed in accordance with Regulation Section 1.704-2(g). Allocations of gross income and gain pursuant to this Section 4.3.2 shall be made first from gain recognized from the disposition of Company assets subject to nonrecourse liabilities (within the meaning of the Regulations promulgated under Code Section 752), to the extent of the Minimum Gain attributable to those assets, and thereafter, from a pro rata portion of the Company's other items of income and gain for the taxable year. It is the intent of the parties hereto that any allocation pursuant to this Section 4.3.2 shall constitute a "minimum gain chargeback" under Regulation Section 1.704-2(f).

4.3.3. <u>Contributed Property and Book-ups</u>. In accordance with Code Section 704(c) and the Regulations thereunder, as well as Regulation Section 1.704-1(b)(2)(iv)(d)(3), income, gain, loss, and deduction with respect to any property contributed (or deemed contributed) to the Company shall, solely for tax purposes, be allocated among the Interest Holders so as to take account of any variation between the adjusted basis of the property to the Company for federal income tax purposes and its fair market value at the date of contribution (or deemed contribution). If the adjusted book value of any Company asset is adjusted as provided herein, subsequent allocations of income, gain, loss, and deduction with respect to the asset shall take account of any variation between the adjusted basis of the asset for federal income tax purposes and its adjusted book value in the manner required under Code Section 704(c) and the Regulations thereunder. The Manager shall determine the applicable method of applying Code Section 704(c) and the Regulations thereunder.

4.3.4. <u>Code Section 754 Adjustment</u>. To the extent an adjustment to the tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulation Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of the adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases basis), and the gain or loss shall be specially allocated to the



Interest Holders in a manner consistent with the manner in which their Capital Accounts are required to be adjusted pursuant to that Section of the Regulations.

4.3.5.  Nonrecourse Deductions.  Nonrecourse Deductions for a taxable year or other period shall be specially allocated among the Interest Holders in proportion to their Percentages.

4.3.6.  Member Loan Nonrecourse Deductions.  Any Member Loan Nonrecourse Deduction for any taxable year or other period shall be specially allocated to the Interest Holder who bears the risk of loss with respect to the loan to which the Member Loan Nonrecourse Deduction is attributable in accordance with Regulation Section 1.704-2(i).

4.3.7.  Guaranteed Payments.  To the extent any compensation paid to any Member by the Company, including any fees payable to any Member pursuant to Section 5.3 hereof, is determined by the Internal Revenue Service not to be a guaranteed payment under Code Section 707(c) or is not paid to the Member other than in the Person's capacity as a Member within the meaning of Code Section 707(a), the Member shall be specially allocated gross income of the Company in an amount equal to the amount of that compensation, and the Member's Capital Account shall be adjusted to reflect the payment of that compensation.

4.3.8.  Unrealized Receivables.  If an Interest Holder's Interest is reduced (provided the reduction does not result in a complete termination of the Interest Holder's Interest), the Interest Holder's share of the Company's "unrealized receivables" and "substantially appreciated inventory" (within the meaning of Code Section 751) shall not be reduced, so that, notwithstanding any other provision of this Agreement to the contrary, that portion of the Profit otherwise allocable upon a liquidation or dissolution of the Company pursuant to Section 4.4 hereof which is taxable as ordinary income (recaptured) for federal income tax purposes shall, to the extent possible without increasing the total gain to the Company or to any Interest Holder, be specially allocated among the Interest Holders in proportion to the deductions (or basis reductions treated as deductions) giving rise to such recapture. Any questions as to the aforesaid allocation of ordinary income (recapture), to the extent such questions cannot be resolved in the manner specified above, shall be resolved by the Manager.

4.3.9.  Withholding.  All amounts required to be withheld pursuant to Code Sections 1445 or 1446 or any other provision of federal, state, or local tax law shall be treated as amounts actually distributed to the affected Interest Holders for all purposes under this Agreement.

4.4.  Liquidation and Dissolution.

4.4.1.  If the Company is liquidated, the assets of the Company shall be distributed to the Interest Holders in accordance with the balances in their respective Capital Accounts, after taking into account the allocations of Profit or Loss pursuant to



Sections 4.1 or 4.2, if any, and distributions, if any, of cash or property, if any, pursuant to Sections 4.1 and 4.2.3.

4.4.2. No Interest Holder shall be obligated to restore a Negative Capital Account.

4.5. <u>General</u>.

4.5.1. Except as otherwise provided in this Agreement, the timing and amount of all distributions shall be determined by the Manager.

4.5.2. If any assets of the Company are distributed in kind to the Interest Holders, those assets shall be valued on the basis of their fair market value, and any Interest Holder entitled to any interest in those assets shall receive that interest as tenant-in-common with all other Interest Holder so entitled. Unless the Members otherwise agree, the fair market value of such assets shall be determined by an independent appraiser who shall be selected by the Manager. The Profit or Loss for each unsold asset shall be determined as if the asset had been sold at its fair market value, and the Profit or Loss shall be allocated as provided in Section 4.2 and shall be properly credited or charged to the Capital Accounts of the Interest Holders prior to the distribution of the assets in liquidation pursuant to Section 4.4.

4.5.3. All Profit and Loss shall be allocated, and all distributions shall be made to the Persons shown on the records of the Company to have been Interest Holders as of the last day of the taxable year for which the allocation or distribution is to be made. Notwithstanding the forgoing, unless the Company's taxable year is separated into segments, if there is a Transfer or an Involuntary Withdrawal during the taxable year, the Profit and Loss shall be allocated between the original Interest Holder and the successor on the basis of the number of days each was an Interest Holder during the taxable year; provided, however, the Company's taxable year shall be segregated into two or more segments in order to account for Profit for Loss, or proceeds attributable to a Capital Transaction or to any other extraordinary nonrecurring items of the Company.

4.5.4. The Manager is hereby authorized, upon the advice of the Company's tax counsel, to amend this Section IV to comply with the Code and the Regulations promulgated under Code Section 704(b); provided, however, that no amendment shall materially affect distributions to an Interest Holder without the Interest Holder's prior written consent.



**Section V.**
**Management: Rights, Power, and Duties**

5.1.   <u>Management</u>.

    5.1.1.   <u>Manager</u>. Jignesh N. Pandya is hereby appointed the sole manager of the Company (the "<u>Manager</u>").   The Manager shall have full, exclusive, and complete discretion, power, and authority, subject in all cases to the other provisions of this Agreement and the requirements of applicable law, to manage, control, administer, and operate the business and affairs of the Company for the purposes herein stated, and to make all decisions affecting such business and affairs. No other Person shall have any right or authority to act for or bind the Company except as permitted in this Agreement, as required by law, or as expressly agreed to in writing by the Manager.

    5.1.2.   <u>General Powers</u>.   The Manager shall have the full power to execute and deliver, for and on behalf of the Company, any and all documents and instruments which may be necessary or desirable to carry on the business of the Company, including, without limitation, any and all deeds, contracts, leases, mortgages, deeds of trust, promissory notes, security agreements, and financing statements pertaining to the Company's assets or obligations, and to authorize the confession of judgment against the Company.   No person dealing with the Manager need inquire into the validity or propriety of any document or instrument executed in the name of the Company by the Manager, or as to the authority of the Manager executing the same.

    5.1.3.   <u>Limitation on Authority of Members</u>.

        5.1.3.1.      No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member. No Member (other than the Manager) shall take part in, or interfere in any manner with, the management, conduct or control of the business and affairs of the Company.

        5.1.3.2.      Any Member who takes any action or binds the Company in violation of this Section 5.1 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to any such loss or expense.

    5.1.4.   <u>Resignation of Manager</u>. The Manager may resign upon thirty (30) days written notice to the Members, after which notice the Members may elect a new Manager.

5.2.   <u>Meetings of and Voting by Members</u>.   Unless required by law, meetings of the Members need be held and there shall be no requirement for an annual meeting of the Members. Meetings, however, if held shall be governed by this Section 5.2.

5.2.1.   A meeting of the Members may be called at any time by the Manager or by those Members holding fifty-one percent (51%) or more of the Percentages then held by Members.   Meetings of Members shall be held at the Company's principal place of business or at any other place in Pennsylvania designated by the Person calling the meeting.  Not less than five (5) nor more than ninety (90) days before each meeting, the Person calling the meeting shall given written notice of the meeting to each Member entitled to vote at the meeting.  The notice shall state the time, place, and purpose of the meeting.   Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of the Members' meetings, or is present at the meeting in person or by proxy.  Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding fifty-one percent (51%) or more of the Percentages then held by Members constitutes a quorum.   A Member may vote either in person or by written proxy signed by the Member or by his duly authorized attorney-in-fact.

5.2.2.   Except as otherwise provided in this Agreement, the affirmative vote of Members holding fifty-one percent (51%) or more of the Percentages then held by Members shall be required to approve any matter coming before the Members.

5.2.3.   In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members holding fifty-one percent (51%) or more of the Percentages then held by Members.

5.2.4.   Except as otherwise provided in this Agreement, wherever the Law requires unanimous consent to approve or take any action, that consent shall be given in writing and, in all cases, shall mean, rather than the consent of all Members, the consent of Members holding fifty-one percent (51%) or more of the Percentages then held by Members.

5.3.   Personal Services.

5.3.1.   No Member shall be required to perform services for the Company solely by virtue of being a Member.   Unless approved by the Manager, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company.

5.3.2.   Upon the approval by Members holding fifty-one percent (51%) or more of the Percentages then held by Members, the Manager shall be entitled to compensation for services performed for the Company.  Upon substantiation of the amount and purpose thereof, the Manager shall also be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

5.4.   Duties of Parties.

5.4.1.  The Manager shall devote such time to the business and affairs of the Company as is necessary to carry out the Manager's duties set forth in this Agreement.

5.4.2.  Except as otherwise expressly provided in Section 5.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member, or of any Affiliate of any Member, to conduct any other business or activity whatsoever, and the Member shall not be accountable to the Company or to any Member with respect to that business or activity even if the business or activity competes with the Company's business.  The organization of the Company shall be without prejudice to their respective rights (or the rights of their respective Affiliates) to maintain, expand, or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member or the Member's Affiliates.

5.4.3.  Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members and their Affiliates.  In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

5.5.  <u>Liability and Indemnification.</u>

5.5.1.  The Manager shall not be liable, responsible, or accountable, in damages or otherwise, to any Member or to the Company for any services performed by the Manager within the scope of the authority conferred on the Manager by this Agreement, except for fraud or gross negligence.

5.5.2.  The Company shall indemnify the Manager for any act performed by the Manager within the scope of the authority conferred on the Manager by this Agreement, except for fraud or gross negligence.

5.6.  <u>Power of Attorney.</u>

5.6.1.  <u>Grant of Power.</u>  Each Member constitutes and appoints the Manager as the Member's true and lawful attorney-in-fact ("<u>Attorney-in-Fact</u>"), and in the Member's name, place and stead, to make, execute, sign, acknowledge, and file:

5.6.1.1.  one or more Articles of Organization;

5.6.1.2.  all documents (including amendments to the Articles of Organization) which the Attorney-in-Fact deems appropriate to reflect may amendment, change, or modification of this Agreement;

5.6.1.3.  any and all other certificates or other instruments required to be filed by the Company under the laws of the State of Connecticut or of any other state or jurisdiction, including, without limitation, any certificate or other

instruments necessary in order for the Company to continue to qualify as a limited liability company under the laws of the State of Connecticut;

5.6.1.4.    one or more fictitious or trade name certificates; and

5.6.1.5.    all documents which may be required to dissolve and terminate the Company and to cancel its Articles of Organization.

5.6.2. <u>Irrevocability</u>.   The foregoing power of attorney is irrevocable and is coupled with an interest, and, to the extent permitted by applicable law, shall survive the death or disability of a Member. It also shall survive the Transfer of an Interest, except that if the transferee is approved for admission as a Member, this power of attorney shall survive the delivery of the assignment for the sole purpose of enabling the Attorney-in-Fact to execute, acknowledge, and file any documents needed to effectuate the substitution. Each Member shall be bound by any representations made by the Attorney-in-Fact pursuant to this power of attorney, and each Member hereby waives any and all defenses which may be available to contest, negate, or disaffirm the action of the Attorney-in-Fact taken under this power of attorney.

## Section VI.
## Transfer of Interests and Withdrawals of Members

6.1.    <u>Restrictions on Transfer</u>.

6.1.1.    Except as otherwise provided in this Agreement, no Member, other than Jignesh A. Pandya, may Transfer all, or any portion of, or any interest or rights in, the Membership Rights owned by the Member; and no Interest Holder may Transfer all, or any portion of, or any interest or rights in, any Interest without the prior written consent of the Manager.   Each Member hereby acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members. The Transfer of any Membership Rights or Interests in violation of the prohibition contained in this Section 6.1 shall be deemed invalid, null and void, and of no force or effect. Any Person to whom Membership rights are attempted to be transferred in violation of this Section shall not (i) be entitled to vote on matters coming before the Members, (ii) participate in the management of the Company, (iii) act as an agent of the Company, (iv) receive distributions from the Company, or (v) have any other rights in or with respect to the Membership Rights.

Jignesh A. Pandya shall be permitted to transfer his interest without the consent of any Member or Manager.

6.2.    <u>Voluntary Withdrawal</u>.  No Member shall have the right or power to Voluntarily Withdraw from the Company without the prior written consent of the Manager.

6.3.    <u>Optional Redemption in Event of Involuntary Withdrawal</u>.

6.3.1. If the Members elect to continue the Company after an Involuntary Withdrawal, the Withdrawn Member shall be deemed to offer for sale (the "Withdrawal Offer") to the Company all of the Membership Rights owned of record and beneficially by the Withdrawn Member (the "Withdrawal Interest").

6.3.2. The Withdrawal Offer shall be and remain irrevocable for a period (the "Withdrawal Offer Period") ending at 11:59 p.m., local time, at the Company's principal office on the sixtieth (60th) day following the date the Members elect to continue the Company. At any time during the Withdrawal Offer Period, the Company may accept the Withdrawal Offer by notifying the Withdrawn Member (the "Withdrawal Notice") of its acceptance. The Withdrawn Member shall not be deemed a Member or Manager for the purpose of the vote on whether the Company shall accept the Withdrawal Offer.

6.3.3. If the Company accepts the Withdrawal Offer, the Withdrawal Notice shall fix a closing date (the "Withdrawal Closing Date") for the purchase which shall be not earlier than ten (10) or later than ninety (90) days after the expiration of the Withdrawal Period.

6.3.4. If the Company accepts the Withdrawal Offer, the Company shall purchase the Withdrawal Interest for a price equal to the Book Value, as defined in Section 6.7 (the "Withdrawal Purchase Price"). The Withdrawal Purchase Price shall be paid in cash on the Withdrawal Closing Date, unless the Remaining Members elect prior to or on the Withdrawal Closing Date to pay all or any portion of the Withdrawal Purchase Price in installments as provided in Section 6.5 of this Agreement.

6.3.5. If the Company fails to accept the Withdrawal Offer, then the Withdrawing Member or the Withdrawing Member's successor, as the case may be, upon the expiration of the Withdrawal Offer Period, thereafter shall be required to sell the Withdrawal Interest pursuant to Section 6.4.

6.4.   Mandatory Buy-out in Event of Involuntary Withdrawal.

6.4.1. If the Members elect to continue the Company after an Involuntary Withdrawal and the Company fails to accept the Withdrawal Offer pursuant to Section 6.3, the Members other than the Withdrawn Member ("Remaining Members") may purchase, and the Withdrawn Member shall sell the Withdrawal Interest for a price equal to the Withdrawal Purchase Price. In the absence of a contrary agreement among the Remaining Members, each Remaining Member may purchase the Withdrawal Interest in the proportion that his respective Percentage bears to the total Percentages of all of the Remaining Members.

6.4.2. The Remaining Members, by written notice addressed to the Withdrawn Member, shall fix the Withdrawal Closing Date for the purchase. The Withdrawal Closing Date shall not be earlier than ten (10) days or later than one hundred fifty (150) days after the later of the date on which the Involuntary Withdrawal occurred or the date on which the Company received notice of the Involuntary Withdrawal.

6.4.3.  The Withdrawal Purchase Price shall be paid in cash on the Withdrawal Closing Date, unless the Remaining Members elect prior to or on the Withdrawal Closing Date to pay all or any portion of the Withdrawal Purchase Price in installments as provided in Section 6.5 of this Agreement.  Simultaneously with the payment of the Withdrawal Purchase Price and/or the delivery of the Remaining Members' promissory notes to evidence their respective obligations to pay the Withdrawal Purchase Price, as applicable, the Withdrawn Member shall execute and deliver to the Remaining Members those assignments and other instruments as may be reasonably required to vest in the Remaining Members all right, title, and interest in and to the Withdrawal Interest, free and clear of all liens and encumbrances, including, but not limited to, the certificate or certificates evidencing the Withdrawal Interest, together with a power duly endorsed in blank for transfer of the Withdrawal Interest to the Remaining Members.

6.5    Installment Buy-outs.  If the Company or the Remaining Members, as the case may be (the "Purchaser"), elect to pay all or any portion of the Withdrawal Purchase Price (the "Indebtedness") on an installment basis, the Purchaser shall pay the Indebtedness by executing and delivering its or their promissory note to the Withdrawn Member.

6.6    Call Option.

6.6.1  Each Member (other than the Manager) hereby unconditionally and irrevocably grants to the Company an exclusive option to purchase all or any portion of such Member's Membership Rights (the "Call Option"), at the Company's sole and absolute discretion, in accordance with the terms and conditions set forth in this Section 6.6.

6.6.2  Each Member hereby acknowledges and agrees that the Call Option may be exercised by the Company at any time, for any reason and in its sole and absolute discretion.  Upon such exercise, the Company shall deliver a written notice to such Member that the Company has exercised the Call Option.

6.6.3  Should the Company exercise the Call Option, the purchase price to be paid by the Company for such Member's Interest (the "Call Option Purchase Price") shall be the Book Value determined in the manner set forth in Section 6.6.4, divided by the number of Interests outstanding less any amounts owed by such Member to the Company.  The Company shall pay the Call Option Purchase Price to such Member in such manner as shall be determined by the Company in its sole and absolute discretion.  Such Member shall execute and deliver any and all documents necessary to effectuate the transfer of such Member's Interest to the Company, including, but not limited to, the certificate or certificates evidencing such Member's Interest, together with an interest power duly endorsed in blank for transfer of the Interest to the Company.

6.6.4  Each Member hereby acknowledges and agrees that such Member shall have no put option with respect to such Member's Interest.



6.7.    Book Value.  The term "Book Value" means the book value of the respective Member's equity in the Company as of the end of the last full taxable year immediately preceding the year in which the event giving rise to the purchase and sale of the Membership Rights or Interest occurred.   Notwithstanding anything contained in this Agreement to the contrary, the computation of Book Value shall be subject to the following provisions:

6.7.1.   Book Value shall not include any proceeds collected or collectible by the Company, under any policy or policies of life or disability insurance insuring the life or disability of a Member, as a result of the death or disability of a Member.

6.7.2.   No additional allowance of any kind shall be made for the goodwill, trade names, or any other intangible asset or assets of the Company other than the aggregate dollar amount for any of those intangible assets appearing on the most recent balance sheet of the Company prior to the date on which Book Value is to be determined.

6.7.3.   Book Value shall be determined by the accountants regularly employed by the Company.   The determination by the accountants shall, for purposes of this Agreement, be final, conclusive, and binding upon each of the parties hereto.

## Section VII.
## Dissolution, Liquidation, and Termination of the Company

7.1.    Events of Dissolution.  The Company shall be dissolved upon the happening of any of the following events:

7.1.1.   When the period fixed for its duration in Section 2.4 has expired;

7.1.2.   Upon the unanimous written agreement of all of the Members;

7.1.3.   Upon the occurrence of an Involuntary Withdrawal of a Member, unless the remaining Members, within ninety (90) days after the occurrence of the Involuntary Withdrawal, unanimously elect to continue the business of the Company pursuant to the terms of this Agreement; or

7.1.4.   Upon the entry of an order of judicial dissolution under Section 8972 of the Law.

7.2.    Procedure for Winding Up and Dissolution.  If the Company is dissolved, the Manager shall wind up its affairs.  On winding up of the Company, the assets of the Company shall be distributed, first, to creditors of the Company, including Interest Holders and the Manager who are creditors, in satisfaction of the liabilities of the Company, and then to the Interest Holders in accordance with Section 4.4.

7.3.    Filing of Articles of Dissolution.  If the Company is dissolved, the Manager shall file Articles of Dissolution with the Department of State of the State of Connecticut at the time

set forth in the Law. If there is no Manager, then the Articles of Dissolution shall be filed by the remaining Members; if there are no remaining Members, the Articles shall be filed by the last Person to be a Member; if there is neither a Manager, remaining Members, or a Person who last was a Member, the Articles shall be filed by the legal or personal representatives of the Person who last was a Member.

## Section VIII.
### Books, Records, Accounting, and Tax Elections

8.1.   Bank Accounts.  All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name.  The Manager shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

8.2.   Books and Records.

8.2.1.   The Manager shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business.  The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the Articles of Organization and this Agreement and all amendments to the Articles of Organization and this Agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state, or local tax returns.

8.2.2.   Except as set forth in Section 8.4, each Member hereby irrevocably waives any and all rights that such Member may have to receive information from, and to inspect the books and records of, the Company pursuant to the Law and any other laws applicable to the Company.

8.3.   Annual Accounting Period.  The annual accounting period of the Company shall be its taxable year.  The Company's taxable year shall be selected by the Manager, subject to the requirements and limitations of the Code.

8.4.   Reports.  Within seventy-five (75) days after the end of each taxable year of the Company, the Manager shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, such tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year.

8.5.   Tax Matters Partner.  The Manager shall be the Company's tax matters partner ("Tax Matters Partner").  If the Manager is not a Member, the Member designated by vote of a majority in interest of the Members shall serve as Tax Matters Partner.  The Tax Matters Partner shall have all powers and responsibilities provided in Code Section 6231, *et seq.*  The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Partner in performing those duties.  A Member shall be responsible for any costs

incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Partner may compromise any dispute with the Internal Revenue Service without the approval of the Members.

8.6.     Tax Elections. The Manager shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at the Manager's sole and absolute discretion.

8.7.     Title to Company Property.

8.7.1. Except as provided in Section 8.7.2, all real and personal property acquired by the Company shall be acquired and held by the Company in its name.

8.7.2. The Manager may direct that legal title to all or any portion of the Company's property be acquired or held in a name other than the Company's name. Without limiting the foregoing, the Manager may cause title to be acquired and held in its name or in the names of trustees, nominees, or straw parties for the Company. It is expressly understood and agreed that the manner of holding title to the Company's property (or any part thereof) is solely for the convenience of the Company, and all of that property shall be treated as Company property.

## Section IX.
## General Provisions

9.1.     Assurances. Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing, and other acts as the Manager deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

9.2.     Notifications. Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement must be in writing and either delivered personally or sent by certified or registered mail, postage prepaid, return receipt requested. Any notice to be given hereunder by the Company shall be given by the Manager. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.



9.3.   Specific Performance.   The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury.   Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

9.4.   Complete Agreement.   This Agreement constitutes the complete and exclusive statement of the agreement among the Members.   It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty.   Except as expressly provided otherwise herein, this Agreement may not be amended without the written consent of all of the Members.

9.5.   Applicable Law.   All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Connecticut.

9.6.   Section Titles.   The headings herein are inserted as a matter of convenience only and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

9.7.   Binding Provisions.   This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

9.8.   Jurisdiction and Venue.   Any suit involving any dispute or matter arising under this Agreement may only be brought in the United States District Court of Connecticut or any Connecticut court having jurisdiction over the subject matter of the dispute or matter.   All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

9.9.   Terms.   Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.

9.10.   Separability of Provisions.   Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

9.11.   Estoppel Certificate.   Each Member shall, within ten (10) days after written request by the Manager, deliver to the requesting Person a certificate stating, to the Member's knowledge, that: (a) this Agreement is in full force and effect; (b) this Agreement has not been modified except by any instrument or instruments identified in the certificate; and (c) there is no



default hereunder by the requesting Person, or if there is a default, the nature and extent thereof. If the certificate is not received within that ten (10) day period, the Manager shall execute and deliver the certificate on behalf of the requested Member, without qualification, pursuant to the power of attorney granted in Section 5.6.

9.12. <u>Counterparts</u>. This Agreement may be executed by the parties hereto on any number of separate counterparts, and all such counterparts so executed constitute one agreement binding on all the parties hereto notwithstanding that all the parties hereto are not signatories to the same counterpart. For purposes of this Agreement, a document (or signature page thereto) signed and transmitted by facsimile machine or portable document file ("<u>PDF</u>") is to be treated as an original document. The signature of any party thereon is to be considered as an original signature, and the document transmitted is to be considered to have the same binding effect as an original signature on an original document. At the request of any party hereto, any facsimile or PDF document is to be re-executed in original form by the parties who executed the facsimile or PDF document. No party hereto may raise the use of a facsimile machine or PDF or the fact that any signature was transmitted through the use of a facsimile machine or by PDF as a defense to the enforcement of this Agreement or any amendment or other document executed in compliance with this Section 9.12.

## Section X.

## Management Fee

10.1 <u>Management Fee</u>. The Manager is hereby authorized to enter into any management agreements for the operation of any of the Pizza Hut stores owned by the Company and pay a Management Fee for such services rendered, all in the sole discretion of the Managers.

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed, under seal, as of the date set forth hereinabove.

Jignesh N. Pandya

Kishan J. Patel

**Limited Liability Company**
**Operating Agreement**

**Exhibit A**
**List of Members and Percentages**

| Name and Address | Percentages |
|---|---|
| Jignesh N. Pandya<br>1471 Hidden Pond Drive<br>Yardley, PA 19067 | 75% |
| Kishan J. Patel<br>395 New Dover Road<br>Colonia, NJ  07067 | 25% |

{CLIENT FILES\2805\0001\GENBUS\AGR\00115319.DOC;3}A-1