2010 WL 4683726
Only the Westlaw citation is currently available.
United States District Court,
E.D. Wisconsin.

SCHREIBER FOODS, INC., Plaintiff,

v.

LEI WANG and Mature Sky, Ltd., Defendants.

No. 08–C–962.
|
Nov. 10, 2010.

**Attorneys and Law Firms**

George Burnett, Thomas Wickham Schmidt, Liebmann Conway Olejniczak & Jerry SC, Green Bay, WI, for Plaintiff.

Joseph M. Nicks, Godfrey & Kahn SC, Green Bay, WI, William J. Leonard, Wang Leonard & Condon, Chicago, IL, for Defendants.

## DECISION AND ORDER

WILLIAM C. GRIESBACH, District Judge.

*1 Plaintiff Schreiber Foods, Inc., commenced this action against Lei Wang, a Chinese-born American citizen, and Mature Sky, Ltd, a Chinese trading company, for the more than $600,000 it claims is due and owing for 200 metric tons of demineralized whey powder it shipped to China pursuant to a purchase order issued by Mature Sky. Mature Sky has never been served and is not a party. Schreiber's claims against Lei Wang are for intentional and strict liability misrepresentation in connection with the transaction and conspiracy to convert. Federal jurisdiction exists under 28 U.S.C. § 1332, and the case is presently before the Court on cross motions for summary judgment. For the reasons that follow, Lei Wang's motion will be granted and Schreiber's denied.

## BACKGROUND

On or about June 13, 2007, Plaintiff Schreiber Foods, Inc., a Wisconsin corporation headquartered in Green Bay, received a purchase order for 200 metric tons of Demineralized Whey Powder 70% (D70) from a Chinese trading company named Mature Sky Limited. The expectation was that Mature Sky would then sell the D70 to Inner Mongolia Yili Industrial Group Co. Ltd. ("Yili"), a Chinese dairy conglomerate. Mature Sky agreed to pay Schreiber $3,105 per metric ton for a total cost of $603,000, due 60 days after the containers departed port. Schreiber accepted the purchase order and on July 31, 2007, began a series of shipments to China of Reduced Minerals Whey Blend (RMW–2), which it claims is essentially the same product as D70. The last container arrived in China on September 24, 2007. Although it is unclear what happened to the RMW–2, Schreiber was never paid.

The agreement to sell whey to Mature Sky had grown out of discussions between Schreiber Global Sales Associate Juliet Prescod and Lei Wang, who resides in Chicago, Illinois and owns an automotive component supply business there. Lei Wang approached Schreiber at the request of her cousin Cade Wang, who lives in China and partially owns and operates Mature Sky and another trading company named Beijing Zhong Sheng Yong Xing Trading Co., Ltd ("Zhong Sheng"). Cade Wang told his cousin that he was doing business with Yili and asked her to help him locate sources for dairy product ingredients in the United States. In late November 2006, Cade Wang arranged for Lei Wang to meet with Yili executives so she would have some idea of what Yili needed and how it did business.

Upon her return to the United States, Lei Wang met with Prescod at Schreiber's offices in Green Bay in January 2007 and explained that she was trying to help her cousin locate sources of dairy product ingredients in the United States to be sold to one of his trading companies and then re-sold to Yili. Lei Wang explained to Prescod that she did not really know anything about the dairy product ingredient business. She also never claimed to be an agent of Yili, nor did she claim that either Cade Wang or his trading company represented Yili. Despite this fact, Prescod asked Lei Wang to provide Yili's credit information on Schreiber's credit application form, which request Lei Wang forwarded to Cade Wang. Shortly thereafter Cade Wang faxed a copy of the credit application form to Prescod bearing the purported signature of one of Yili's executives, Kaiyu Yu, which Schreiber claims is not genuine.

**\*2** In any event, on or about February 2, 2007, prior to the transaction that is the subject of this action, Prescod received from Mature Sky a purchase order for a much smaller amount of WPC34, a whey protein concentrate, at the price of $42,240. Prescod realized that the purchase order did not come from Yili, but was not concerned because Schreiber was relying on Cade Wang and his trading company to sell the product to Yili. Although she forwarded the purchase order to Schreiber's credit department, no credit check was ever performed on Mature Sky. At the same time, the documentation Prescod submitted to Schreiber's customer service department suggested that Yili was the customer. Prescod later cleared up the confusion and directed Schreiber's international logistics department to send the documentation for the WPC34 order to Cade Wang's other trading company, Zhong Sheng, which he used to organize the logistics of the purchase and resale to Yili. Thereafter, Schreiber treated Zhong Sheng as the customer and sent it both product samples and shipping documents.

Despite this confusion, the sale of WPC34 was successful. Schreiber shipped the WPC34 to China, Zhong Sheng sold it to Yili, Yili paid Zhong Sheng, and Schreiber was paid. Due to delays in transferring funds from China, Lei Wang actually paid Schreiber the $42,240 invoice amount with a check drawn on the account of her automotive components business, but she was later reimbursed by Zhong Sheng. Based on the success of their first transaction, Lei Wang and Prescod immediately began discussing a second, larger purchase of a different product known as D70, which is used as an ingredient in infant formula.

On May 25, 2007, Lei Wang sent Prescod an email requesting Schreiber's "D70 and WPC 34% cif and fob price with the total amount you can sale[sic]." Prescod responded on May 29, 2007, by providing price quotes and quantities for these products. On May 30, 2007, Lei Wang responded with the following e-mail:

Hi Juliet

How are you! I am so appreciate you to cut $50 off on this D70 product. That really did much to our cooperation. I am having conference on this product with Yili these days, they showed that the price of WPC34 and D70 you offered are at the peak of current quotation. But I had persuaded them to accept it in order to continue the cooperation between us as I honestly hope to do business with you. As to the sample, I am glad to hear that is going to be available soon and I will tell you where to send by you having it. Have a good day! Lei

(PFOF ¶ 14). Prescod responded to Lei Wang's e-mail the same day by seeking clarification that Yili did in fact want the product at the quoted price:

Hi Lei,

Things are good. Does this mean that Yili wants the 10 containers I have available to ship @ 3015 USD/MT CIF Dalian? Please confirm because I have other people interested but I'm trying to hold on to them for this order. You can show them the attached also because U.S. pricing is not going to go down. I sent the sample today to Michelle at the same address we sent the export documents.

**\*3** (PFOF ¶ 15). Lei Wang responded, also that same day, and confirmed Yili's willingness to buy at the quoted price:

Yes. Yili accept this price. But I am not sure this is for the Dalian location. Because WPC last time is for Dalian location. Yili have more factorys [sic]. This price can be for any location in China for Yili. This price only to the China port. If other location has more charge I will pay for it.

Thank you for holding this containers for us and I will try my best to make our business success. I told YiLi even though this time we pay higher price but we will have good business relationship set up with your company. In the long run everybody will make money.

Hope to see you soon in Beijing. Lei

(Dkt. 34 at 2–3).

Around the time of this e-mail exchange, Prescod sent a sample of RMW–2, which, to repeat, Schreiber claims is identical to D70, to Zhong Sheng. The sample was apparently found acceptable, and Mature Sky issued its purchase order for 200 metric tons of D70. In response to Mature Sky's purchase order, Schreiber then began shipping RMW–2. When the RMW–2 shipped by Schreiber began arriving in China, Zhong Sheng had difficulty claiming it from Customs because Schreiber had again listed Yili as the consignee. Prescod had Schreiber's

logistics department issue new bills of lading listing Zhong Sheng as the consignee and, as a result, Zhong Sheng was able to take possession of several containers of the RMW–2 on September 23, 2007. What happened thereafter is largely a matter of dispute.

Cade Wang informed Schreiber that Yili would not accept the product because testing showed it had uneven color and may have been a mixture of WPC80 and lactose instead of D70. The last container was never claimed and remained in storage until Schreiber was notified in April of 2008. Lei Wang contends that Schreiber declined to take possession of it at that time because there was no market for it. Lei Wang further contends that even before the first shipments of RMW2 left port in the United States, Schreiber was aware that a previous shipment of RMW–2 to New Bali had failed to clear customs in China because the product did not meet the Chinese Hygienic Standard for whey powder. RMW–2 is a blend of ingredients formulated to have a similar chemical composition to D70, but not made the same way as natural D70. Schreiber purchases RMW–2 from a third party named Main Street Ingredients, Inc. Notwithstanding Schreiber's claim that the two products are the same, Lei Wang contends that RMW–2 is not intended as a replacement for D70 or as an ingredient for infant formula. Lei Wang also suggests that the sample of RMW–2 Prescod sent for testing prior to Mature Sky placing its order was questionable because it did not come from Main Street's production line but was hand blended instead.

Schreiber, on the other hand, denies that its product was defective and contends that Yili simply declined to purchase the product at the price Lei Wang had represented it had agreed to pay. Schreiber claims that Lei Wang intentionally misrepresented her conversations with Yili by informing Prescod that Yili had agreed to pay $603,000 for the 200 metric tons of demineralized whey powder. In fact, Schreiber contends, not only had Yili not agreed to purchase the product at the price Schreiber was offering, but Lei Wang had not even spoken with Yili about it. Because it shipped its product to China in reasonable reliance upon Lei Wang's false representation that Yili had made a firm commitment to purchase the whey powder at the offered price, Schreiber claims that she is liable to it for its loss. Alternatively, Schreiber claims that even if Lei Wang did not intentionally misrepresent her conversations with Yili, she is strictly liable because she has a financial interest in the transaction.

**\*4** Both parties have moved for summary judgment. Schreiber concedes that the issue of whether Lei Wang acted with intent to deceive is not amenable to resolution without a trial and therefore does not seek summary judgment on its intentional tort claims. Schreiber does argue, however, that the material facts relating to its strict liability claim are not in dispute and contends it is entitled to judgment as a matter of law on that claim. Lei Wang, on the other hand, contends that she is entitled to summary judgment on all Schreiber's claims because they are all barred under the economic loss doctrine. Lei Wang also claims that Schreiber's claims fail because the undisputed material facts establish as a matter of law that she made no false representations of fact and Schreiber did not reasonably rely on what it claims were false statements.

### STANDARD OF REVIEW

Summary judgment is required "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." [Fed.R.Civ.P. 56(c)](). The mere existence of some factual dispute does not defeat a summary judgment motion; "the requirement is that there be no genuine issue of material fact." [Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)](). For a dispute to be genuine, the evidence must be such that a "reasonable jury could return a verdict for the nonmoving party." *Id.* For the fact to be material, it must relate to a dispute that "might affect the outcome of the suit." *Id.*

Although summary judgment is a useful tool for isolating and terminating factually unsupported claims, [Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986)](), courts should act with caution in granting summary judgment, [Anderson, 477 U.S. at 255](). When the evidence presented shows a dispute over facts that might affect the outcome of the suit under governing law, summary judgment must be denied. [*Id.* at 248.]()

The moving party bears the initial burden of demonstrating that he is entitled to judgment as a matter of law. [*Celotex Corp.,* 477 U.S. at 323](). Where the moving party seeks summary judgment on the ground that there is an absence of evidence to support the nonmoving party's case, the moving party may satisfy its initial burden

simply by pointing out the absence of evidence. *Id.* at 325. Once the moving party's initial burden is met, the nonmoving party must "go beyond the pleadings" and designate specific facts to support each element of the cause of action, showing a genuine issue for trial. *Id.* at 323–24. Neither party may rest on mere allegations or denials in the pleadings, *Anderson,* 477 U.S. at 248, or upon conclusory statements in affidavits, *Palucki v. Sears, Roebuck & Co.,* 879 F.2d 1568, 1572 (1989).

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). However, it is "not required to draw every conceivable inference from the record-only those inferences that are reasonable." *Bank Leumi Le–Israel, B.M. v. Lee,* 928 F.2d 232, 236 (7th Cir.1991).

### ANALYSIS

**A. Economic Loss Doctrine**

*\*5* Both sides agree that Wisconsin substantive law governs the resolution of this case. Under Wisconsin law, the economic loss doctrine essentially bars the use of tort remedies to recover for purely economic losses that arise out of commercial transactions between contracting parties. *See Digicorp, Inc. v. Ameritech Corp.,* 2003 WI 54, ¶ 34, 262 Wis.2d 32, 662 N.W.2d 652. ("[T]he economic loss doctrine requires transacting parties in Wisconsin to pursue only their contractual remedies when asserting an economic loss claim...."). The economic loss doctrine serves three policies: "(1) to maintain the fundamental distinction between tort law and contract law; (2) to protect commercial parties' freedom to allocate economic risk by contract; and (3) to encourage the party best situated to assess the risk of economic loss, the commercial purchaser, to assume, allocate, or insure against that risk." *Daanen & Janssen, Inc. v. Cedarapids, Inc.,* 216 Wis.2d 395, 403, 573 N.W.2d 842 (1998). Essentially, the economic loss doctrine prevents a party to a commercial transaction from making an end run around its contract by suing in tort in order to avoid a loss, the risk of which it failed to allocate to the other party or insure against. As Judge Crabb succinctly explained:

> Commercial entities are capable of bargaining to allocate the risk of loss inherent in any commercial transaction. A court should assume that parties factor risk allocation into their agreements and that the absence of comprehensive warranties is reflected in the price paid. Permitting parties to sue in tort when the deal goes awry rewrites the agreement by allowing a party to recoup a benefit that was not part of the bargain.

*Stoughton Trailers, Inc. v. Henkel Corp.,* 965 F.Supp. 1227, 1230 (W.D.Wis.1997).

As Lei Wang observes, Schreiber's damages consisting of the unpaid price for its shipment of RMW–2 is purely economic, and all of the policies underlying the economic loss doctrine are applicable in this case. Schreiber could have performed a credit check on Mature Sky and/or Zhong Sheng to determine whether either or both would be able to pay for its shipment if Yili failed to accept it. Schreiber could also have insisted on a letter of credit or other guaranty of payment as a condition of entering into the contract. By bringing tort claims for misrepresentation and conspiracy to convert against Lei Wang, Schreiber seeks to avoid the consequences of its failure to take proper precautions in its contract with Mature Sky. Under these circumstances, Lei Wang contends, Schreiber's tort claims are barred.

In response, Schreiber notes that the Wisconsin Supreme Court has created a "bright line" rule excepting from the economic loss doctrine transactions involving the provision of services as opposed to the sale of goods. *See Insurance Co. of North America v. Cease Electric Inc.,* 2004 WI 139, ¶ 52, 276 Wis.2d 361, 688 N.W.2d 462 (the "economic loss doctrine is inapplicable to claims for the negligent provision of services"). The Supreme Court adopted this "bright line rule" to avoid the case-by-case arguments over which service providers, i.e., doctors, lawyers, electricians, should be subject to tort claims. *Id.* at ¶¶ 49–52. The economic loss doctrine does not bar its tort claims against Lei Wang, Schreiber argues, because as a provider of services rather than a seller of goods, she falls on the other side of that bright line.

*\*6* In *Linden v. Cascade Stone Company,* Inc., 2005 WI 113, 283 Wis.2d 606, 699 N.W.2d 189, the Wisconsin Supreme Court adopted the "predominant purpose test"

to determine whether the economic loss doctrine applies to a mixed contract that encompasses both goods and services. Under the predominant purpose test, courts are to "examine all the factors before them, both objective and subjective, to determine the predominant purpose of a contract." *Id.* at ¶ 22. Here, it seems clear that the predominant purpose of the contract between Schreiber and Mature Sky was for the sale of goods. Schreiber agreed to sell and Mature Sky agreed to purchase 200 metric tons of D70 for $603,000. Indeed, the sole purpose, let alone the predominant purpose, was a sale.

Schreiber argues, that while the purpose of the contract between it and Mature Sky may have been for sale, Lei Wang was providing services akin to a broker. Relying on *Shister v. Patel,* 2009 WI App 163, 322 Wis.2d 222, 776 N.W.2d 632, in which the Wisconsin Court of Appeals held that the economic loss doctrine did not bar a home buyer's tort claims against a real estate broker, Schreiber contends, that Lei Wang was providing similar services here. Just as the home buyer's tort claims against the real estate broker were not barred by the economic loss doctrine in *Shister,* Schreiber argues that its tort claims against Lei Wang also survive.

Regardless of how Lei Wang's role is characterized, however, the predominant purpose of the underlying transaction remains a sale. Lei Wang did not hold herself out as a broker; she explained that she was doing a favor for her cousin. Although she denies any knowledge of his having done so until after Schreiber commenced the action against her, it turns out that Cade Wang conveyed to her 17.5% interest in Mature Sky in return for her assistance. She preformed no service other than communicating her cousin's interest in purchasing dairy ingredients from a United States supplier and serve as a contact for his trading company. This is not enough to transform a contract for sale of goods into a services contract.

Schreiber argues that as an agent for Mature Sky, Lei Wang is independently and personally liable for any torts she committed during the course of her agency. This is true. *See Ramsden v. Farm Credit Servs.,* 223 Wis.2d 704, 715, 590 N.W.2d 1 (Ct.App.1998) ("An agent who makes factual statements that are untrue may incur liability, just as a principal does when he/she makes such statements.") But the economic loss doctrine, where applicable, is not limited to the actual parties to the contract. Indeed, the Wisconsin Supreme Court has made clear that privity of contract is not required for the doctrine to apply. *See Daanen & Janssen, Inc. v. Cedarapids, Inc.,* 216 Wis.2d 395, 573 N.W.2d 842, 845 (1998); *see also Digicorp,* 2003 WI 54, ¶¶ 63–65, 262 Wis.2d 32, 662 N.W.2d 652. Moreover, the bar created by the economic loss doctrine operates to protect the agent, as well as the principal of the contracting party. Otherwise the doctrine would be too easily circumvented. If the economic loss doctrine did not bar tort claims against a company's employees and agents acting within the scope of their employment, as well as the company itself, the other party to a transaction could avoid its effect simply by recasting its misrepresentation claim against the employee or agent with whom it actually dealt. Since corporations and other forms of business entities necessarily communicate through their employees and agents, this would be possible in virtually every case. This would frustrate the purposes underlying the economic loss doctrine. For all of these reasons, the economic loss doctrine applies in this case.

**B. Fraud in the Inducement Exception to the Economic Loss Doctrine**

***7** Assuming the economic loss doctrine applies, Schreiber argues alternatively that the fraud in the inducement exception to the economic loss doctrine permits Schreiber's intentional misrepresentation claim to go forward. This exception applies where (1) there was an intentional misrepresentation; (2) the misrepresentation occurred before the contract was formed; and (3) the fraud was extraneous to, rather than interwoven with, the contract. *Kaloti Enterprises, Inc. v. Kellogg Sales Co.,* 2005 WI 111, 283 Wis.2d 555, 699 N.W.2d 205. Put another way, the third element must "concern[ ] matters whose risk and responsibility d[o] not relate to the quality or the characteristics of the goods for which the parties contracted or otherwise involve[ ] performance of the contract." *Id.* at ¶ 31. "[E]xtraneous fraud concerns those matters whose risk and responsibility were not expressly or impliedly dealt with in the contract." *Digicorp,* 2003 WI 54, ¶ 47, 262 Wis.2d 32, 662 N.W.2d 652 (citing *Huron Tool and Eng'g Co. v. Precision Consulting Servs., Inc.,* 209 Mich.App. 365, 367, 532 N.W.2d 541, 543 (1995)). With respect to fraud that is interwoven, "the misrepresentations relate to the breaching party's performance of the contract and do not give rise to an independent cause of action in tort." *Kaloti Enterprises,* 2005 WI 111, ¶ 34, 283 Wis.2d 555, 699 N.W.2d 205 (quoting *Huron Tool,* 532 N.W.2d at 545).

Schreiber easily satisfies the first two requirements of the fraud in the inducement exception to the economic loss doctrine. First, Schreiber has stated a claim for intentional misrepresentation. While some of the elements of intentional misrepresentation are disputed, Schreiber has sufficiently pled the claim for purposes of the fraud in the inducement exception. Second, Lei Wang's alleged misrepresentation occurred before Schreiber accepted the $600,000 purchase order. It is as to the third requirement, however, that Schreiber's claim falters.

Two key cases analyze the third requirement (that the fraud was extraneous to, rather than interwoven with, the contract). An example of an extraneous fraud is found in *Kaloti Enters. v. Kellogg Sales Co.,* in which Kellogg sold $124,000 worth of product to Kaloti, a secondary supplier that was in the business of buying product from a producer (such as Kellogg) and reselling that product to large market stores. *Id.,* 205 WI 111, ¶¶ 3 –7. Kellogg, fully aware of Kaloti's intended use of the product, sold it to Kaloti without ever mentioning that Kellogg had recently begun selling its product directly to the same large market stores. *Id.* Instead Kellogg remained silent about its new direct distribution model, allowing the wholesaler to purchase cereal product. Kaloti's regular customers quickly refused to buy the cereal from the wholesaler because they could buy directly from Kellogg. Once the Kaloti discovered this, it sued. The Supreme Court's analysis of the third requirement of the fraud in the inducement exception is particularly relevant here:

> *8 Finally, the intentional misrepresentation alleged by Kaloti is extraneous to, not interwoven with, the contract. It does not concern Kellogg's and [its agent's] performance of the contract with Kaloti, and it does not regard the quality or character of the NutriGrain and Rice Krispie Treat products that Kellogg sold Kaloti. Rather, the alleged misrepresentation concerned a matter whose risk was never contemplated to be a part of the contract to purchase Kellogg's products. The fact that Kellogg and [its agent] allegedly knew that Kellogg's change in marketing scheme would largely prevent Kaloti from being able to resell the Kellogg products as a secondary supplier, is not a matter that was dealt with in the contract, nor would one expect it to be dealt with in the contract.

*Id.* ¶ 45. Thus, Kellogg's silence was an extraneous misrepresentation because it did not affect the quality of the product or any other issue contemplated and negotiated in the contract. *Id.* ¶ 45. Accordingly, the Wisconsin Supreme Court held that the fraud in the inducement exception allowed the wholesaler's intentional misrepresentation claim to go forward despite the economic loss doctrine.

In *Wickenhauser v. Lehtinen,* 2007 WI 82, 302 Wis.2d 41, 734 N .W.2d 855, the Supreme Court of Wisconsin again applied the fraud in the inducement exception to the economic loss doctrine. The Court found that all three requirements were satisfied where a real estate investor promised to obtain a $200,000 loan for a farm family. The investor also secured an option to purchase the entire 300 acre farmland by telling the landowners that he would not record the option. In fact the investor did record the option and later sued on it. Specifically the Court found that the fraud was "extraneous to, rather than interwoven with, the contract" because the investor's representations were made to "induce the [landowners] to sign the option. The misrepresentations did not relate to [investor's] performance of the contract, which was to obtain a $200,000 loan. Therefore, this fraud gives rise to an independent cause of action in tort." *Id.* at 869.

Applying the principles gleaned from those cases here, Schreiber's contention that such representations are "extraneous, yet material" is unpersuasive. Schreiber is correct that Lei Wang's statement "Yili accept this price" does not regard the quality or character of the goods sold. But Lei Wang's representations do "otherwise involve[ ] performance of the contract ." *Kaloti Enters. v. Kellogg Sales Co.,* 2005 WI 111, ¶ 31. Indeed, the alleged misrepresentation directly relates to Mature Sky's ability to perform, i.e. pay Schreiber for its product. As the May 30, 2007 email chain demonstrates, the dialogue between Lei Wang and Ms. Prescod related to terms and conditions of the contract; for example Lei Wang and Ms. Prescod discussed the price, the quantity, and the delivery details of the order. Prescod candidly admitted that she was not concerned about Mature Sky's ability to pay because Schreiber was looking to Yili as the source of payment.

This is not a situation like *Kaloti* where one party ended up being harmed by risks that he was unaware of and could not have anticipated. Nor was it like *Wickenhauser* where the fraudulent promise not to record the option was deemed incidental and extraneous to the loan agreement. Here, Schreiber was fully aware of the necessity of Yili purchasing its whey powder if it was to be paid by Mature Sky. Thus, the alleged fraud concerns a matter directly dealt with in the contract, namely, Mature Sky's payment for the product. The possibility of nonpayment was a risk Schreiber could easily have protected itself against by the manner in which it structured the transaction with Mature Sky. Having failed to do so, it cannot resort to tort remedies. Because Lei Wang's representations are not extraneous to but are interwoven with the contract, the fraudulent inducement exception to the economic loss doctrine does not apply and Schreiber is limited to its contractual remedies.

## CONCLUSION

**\*9** Accordingly, and for the reasons stated above, Lei Wang's motion for summary judgment is **granted** and Schreiber's is denied. All claims against Lei Wang are dismissed with prejudice; those against Mature Sky are dismissed but without prejudice. The clerk shall enter judgment accordingly.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 4683726

---

**End of Document**   © 2016 Thomson Reuters. No claim to original U.S. Government Works.